# CALLAGHAN *v.* MYERS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE NORTHERN DISTRICT OF ILLINOIS.

No. 71. Argued November 8, 9 1888. — Decided December 17, 1888.

Although there can be no copyright in the opinions of the judges of a
court, or in the work done by them in their official capacity as judges,
there is no ground of public policy on which a reporter, who prepares a
volume of law reports, of the usual character, can be debarred from
obtaining a copyright for the volume, which will cover the matter which
is the result of his intellectual labor.

He has a right to take such copyright when there is no legislation for-
bidding him to do so, or directing that the proprietary right which
would exist in him shall pass to the State, or that the copyright shall be
taken out for or in the name of the State, as the assignee of such right,
even though he is a sworn public officer, with a fixed salary.

The copyright of the volume taken by the reporter, as author, will cover
the parts of the book of which he is the author, although he has no exclu-
sive right in the judicial opinions published.

Such copyright may cover the title-page, the table of cases, the head-notes
or syllabuses, the statements of facts, the arguments of counsel, and the
index, comprehending, also, the order of arrangement of the cases, the
division of the reports into volumes, the numbering and paging of the
volumes, the table of the cases cited in the opinions, and the subdivision
of the index into appropriate condensed titles, involving the distribution
of the subjects of the various head-notes, and cross references.

The three conditions prescribed by the copyright act of February 3, 1831,
c. 16, 4 Stat. 436, namely, the deposit before publication of the printed
copy of the title of the book, the giving of information of the copy-
right by the insertion of a notice thereof on the title page or the next
page, and the depositing of a copy of the book within three months
after the publication, are conditions precedent to the perfection of the
copyright.

A certified copy, under the hand and seal of the clerk of the District Court of
the United States, in whose office the copy of the title of the book was
deposited, of the record of the same, the certificate bearing date the day
of such deposit, with a memorandum underneath of the fact and date of
the deposit of the work, signed by the same clerk, is sufficient *primâ facie*
evidence not only of the fact and date of the deposit of the title, but of
the fact and date of the deposit of the work; and it will be presumed,
in the absence of evidence to the contrary, that the deposit of the title
was made before publication, and also that where the work purports to

have been deposited within three months after the date of the deposit of the title, it was deposited within three months after publication.

Where the deposit of the title and the deposit of the work purport to have been made on the same day, it will be presumed, in the absence of evidence to the contrary, that the deposit of the title was made before publication, and that the deposit of the work was not made prior to publication.

Where the work purports to have been deposited more than three months after the deposit of the title, it will not be presumed that the deposit of the work was made within three months after publication.

The case distinguished from *Merrell* v. *Tice*, 104 U. S. 557.

The delivery by the reporter, of copies of a volume of reports to the prescribed officer of a State, under a statute, for its use, accompanied by the payment of the reporter therefor, was a publication of the book, so as to require the deposit of the work in the clerk's office within three months after such publication, to make the copyright valid.

Where the copy of the title and the work were deposited in the clerk's office on the same day the copies were delivered by the reporter to the State, it will be presumed, in the absence of evidence to the contrary, that the deposit of the title preceded the publication, and that the delivery of the copies to the State preceded the deposit of the work.

Where the title was deposited in 1867 and the notice printed in the volume purported to show that the copyright was entered in 1866, the variance was immaterial.

Where the title was deposited by "E. B. Myers & Chandler," a firm, as proprietors, and the printed notice of entry of copyright in the volume stated that the copyright was entered by "E. B. Myers," a member of such firm, the variance was immaterial.

A written transfer of the manuscript of the volume from the reporter to the person taking out the copyright as proprietor was not necessary, and parol evidence was competent to show his ownership thereof at the time of the infringement.

On the evidence, it was held that the plaintiff had not consented to or acquiesced in the infringement or abandoned his copyright, or been guilty of laches.

The question of infringement considered and decided in favor of the plaintiff.

It is proper, in an interlocutory decree for an accounting before a master in a copyright case, to direct that the defendant may be examined in regard to the subject-matter of the accounting, and may be required to produce his account books and papers.

Although the bill prays for a forfeiture to the plaintiff, under the statute, of copies in the possession of the defendant of the infringing volume, and for their delivery to the plaintiff, yet, if the final decree does not award any forfeiture, the defendant is not injured by anything done under such provision of the interlocutory decree; nor can the penalties given by § 7 of the act of 1831 be enforced in a suit in equity; nor can

evidence obtained from the defendant through his examination and the production by him of his books and papers be used against him in any other suit in which a forfeiture is sought.

The cost of stereotyping a volume is not a proper credit to be allowed to a defendant; nor is the amount paid to the members of a defendant firm for their services in the way of salaries, during the time of infringement, as a part of the expense of conducting its business; nor is the cost of producing copies of the volume which were not sold; nor is the amount paid for editorial work in preparing the infringing volume.

It is proper to charge the defendant with his profit on the resale by him of copies once sold by him, and then repurchased, although he is also charged with his profit on the original sale of such copies.

The lawful matter in the infringing volume being useless without the unlawful, and it being impossible to separate the profit on the latter from that on the former, and the volume being sold as a whole, the defendant is responsible for the consequences, and the plaintiff is entitled to recover the entire profit on the sale of the volume, if he so elects.

In considering exceptions to a master's report in matters of fact, questioning his conclusions in respect to the amount of the defendant's profits, those conclusions, depending on the weighing of conflicting testimony, will not be set aside or modified, unless there clearly appears to have been error or mistake on his part.

THE case, as stated by the court, was as follows:

This is a suit in equity, brought in the Circuit Court of the United States for the Northern District of Illinois, on the 17th of December, 1877, by Eugene B. Myers against Bernard Callaghan, Andrew Callaghan, Andrew P. Callaghan, and Sheldon A. Clark, composing the firm of Callaghan & Co., Marshall D. Ewell, and Van Buren Denslow.

The bill sets forth that the firm of E. B. Myers & Chandler, composed of the plaintiff and Horace P. Chandler, became the proprietors of volumes 32 to 38, both inclusive, of the reports of the Supreme Court of the State of Illinois, known as "Illinois Reports," prepared by Norman L. Freeman; that, as such proprietors, said firm, desiring to secure a copyright for the several volumes, under the statutes of the United States, deposited in the office of the clerk of the District Court of the United States for the Northern District of Illinois, before publication, a printed copy of the title of the several volumes; and that they afterwards, and within three months of the publication of the volume, deposited in said office a copy of the

work. The dates of the deposit of the titles of the several volumes were as follows: Volume 32, August 12, 1865; 33, April 21, 1866; 34, October 23, 1866; 35, January 28, 1867; 36, October 11, 1867; 37, December 31, 1866; 38, August 22, 1867. The alleged dates of the deposit in said office of a copy of the several volumes were as follows: Volume 32, January 17, 1866; 33, June 8, 1866; 34, October 23, 1866; 35, March 5, 1867; 36, November 13, 1867; 37, January 28, 1867; 38, October 10, 1867.

The bill also alleges that the plaintiff became the proprietor of volumes 39 to 46, both inclusive, of the reports of the Supreme Court of the State of Illinois, known as "Illinois Reports," prepared by Norman L. Freeman; that, as such proprietor, he, desiring to secure a copyright for the several volumes under the statutes of the United States, deposited in the office of the clerk of the District Court of the United States for the Northern District of Illinois, before publication, a printed copy of the title of the several volumes; and that he afterwards, and within three months of the publication of the volume, deposited in said office a copy of the work. The dates of the deposit of the titles of the several volumes were as follows: Volume 39, June 10, 1868; 40, September 18, 1868; 41, December 22, 1868; 42, May 21, 1869; 43, June 21, 1869; 44, September 27, 1869; 45, October 6, 1869; 46, October 14, 1869. The alleged dates of the deposit in said office of a copy of the several volumes were as follows: Volume 39, June 12, 1868; 40, November 6, 1868; 41, January 29, 1869; 42, July 7, 1869; 43, July 7, 1869; 44, October 2, 1869; 45, December 8, 1869; 46, December 8, 1869.

The bill further alleges that all the volumes were prepared by Mr. Freeman, and each contained a large amount of matter original with him, and a great number of the decisions and opinions of the Supreme Court of Illinois; that, among other original matter, Mr. Freeman prepared for each case a sylla-bus or head-notes, and for many cases in each volume a state-ment of the facts of the case; that also in many of them he copied, or copied and arranged, the instructions ruled upon by the court below; that he also prepared and inserted, or gave,

in all or many of them, the stipulations made, or made and filed, therein, and in many of them he gave the errors assigned; that he also prepared, for each of them, a table of the cases cited therein, and a table of the cases decided, and other original matter, and so arranged said decisions and the matter therein contained, or the matter in connection with the decisions, as to make each of the books, or each of the books and the matter therein contained, convenient and valuable to the persons using the decisions; that, in respect of volumes 32 to 38, the firm of E. B. Myers & Chandler, and in respect of volumes 39 to 46, the plaintiff, purchased from Mr. Freeman all his proprietary rights in the volumes, and paid him a large consideration therefor, and for his labor and care in preparing them, and used the labor and matter of Mr. Freeman in publishing the books; that, by the agreements with Mr. Freeman, the plaintiff and his partner were to have the copyright of volumes 32 to 38, and the plaintiff the copyright of volumes 39 to 46; that in respect of volumes 32 to 38, the said firm, and in respect of volumes 39 to 46, the plaintiff, divided the decisions and the matter accompanying them into volumes, and divided and arranged each of the volumes into pages; that the firm published over 1500 copies of each of the volumes 32 to 38, and the plaintiff over 1500 of each of the volumes 39 to 46; that on the 13th of June, 1868, said Chandler sold and assigned to the plaintiff, by a written assignment, all his interest in and to volumes 32 to 38, and the copyrights thereof; and that the plaintiff still has the exclusive right to volumes 32 to 46.

The bill further alleges that, about July, 1877, the plaintiff reprinted volumes 37 and 38, and, as he made some changes in the arrangement of their pages, he did, before publication, deposit in the office of the Librarian of Congress a copy of the printed title of each volume, on the 20th of July, 1877; that afterwards, on the 28th of July, 1877, and within one month of the publication thereof, he deposited in said office two copies of each of the volumes as reprinted.

The bill also alleges, as to all of the volumes, that the plaintiff had the exclusive right to the arrangement of each of

them, and the exclusive right to publish the head-notes or syllabuses, and to the arrangement of the pages of the books, and to the division of the opinions into separate volumes, and to the table of cases cited and table of cases decided, as published in each of them, and to the arrangement of the decisions, as accompanied with the head-notes, stipulations, errors assigned, instructions, table of cases cited, table of cases reported and indexes accompanying the same, and the exclusive right to all of said works, except to the matter contained in the opinions of the judges; that the defendants had full knowledge of the exclusive rights of the plaintiff, and attempted to buy them from him, but refused to pay the price charged by him, and thereupon, proceeded to reprint and publish volumes 32 to 38, and, in doing so, used the decisions of the Supreme Court of Illinois only as published by the plaintiff, and prepared the volumes from the books of the plaintiff, and did not procure the matter from original sources, and, in all of the books, used the works of the plaintiff and copied the title-pages thereof, and used the division and arrangement of the plaintiff in the volumes and the paging thereof, and copied the table of cases cited and the table of cases reported from each of the books of the plaintiff and also copied from the same the stipulations, errors assigned, and instructions given by the court; that, in publishing the statements of the cases and in preparing the syllabuses, the defendants used the books of the plaintiff and the changes they made were merely colorable, and were made only for the purpose of avoiding the claim of the plaintiff; that the books, as printed and published by the defendants, were all and each merely imitations of the volumes of the plaintiff, corresponding in number; that all and each of said republications by the defendants are piracies on the copyrights of the plaintiff, and the books have been made by them to take the place of, and, as far as they can, to supersede the books of the plaintiff; that the defendants are selling them to the persons who would otherwise buy the books of the plaintiff, to his great damage and loss; that the defendants threaten to republish volumes 39 to 46; and that the aggregate value of the copyrights of the plaintiff is not less than $20,000, and his damage is not less than that sum.

The bill waives an answer on oath, and prays for an injunction perpetually enjoining the defendants from publishing, or selling, or offering for sale, any of the books, and for a decree that all of them so published by the defendants are forfeited to the plaintiff, and that they be delivered to him, and for an account of all published and sold, and for a decree for damages.

The members of the firm of Callaghan & Co. put in an answer to the bill. It sets up that a printed copy of volume 32 was not deposited until more than three months after publication. It avers that but a small amount of original matter was prepared by Mr. Freeman for any of the volumes 32 to 46, and that but few statements of cases were prepared, by him, and those few were drawn by him from the opinions of the court in the cases reported. It denies that he prepared any tables of cases cited for any of those volumes, and denies that he so arranged the decisions and matter contained in the volumes as to make the volumes convénient and of value to the persons using them. It avers that all matters contained in the volumes are public and common property, forming part of the law of the State of Illinois, and as such not susceptible of copyright, or in any manner literary property, in which a private citizen can have a monopoly under the act of Congress regulating the subject of copyright; that whatever labor, literary or otherwise, was done upon the volumes by Mr. Freeman, was done in his official capacity as reporter of the decisions of the Supreme Court of Illinois, a public office then existing under and by virtue of the laws of that State, and to which Mr. Freeman had been duly appointed; and that all labor, literary or otherwise, by Mr. Freeman, in his capacity as official reporter, upon the volumes, was public and common property, not susceptible of copyright or of private literary ownership.

The answer admits that the defendants had negotiations with the plaintiff concerning the purchase of his interest in volumes 39 to 46, consisting of the stereotype plates and printed stock of those volumes; that, in such negotiations, the plaintiff proposed to sell his copyrights in volumes 32 to

46, but no price or value was ever attached by either party to such copyrights, and they were always treated as a mere incident to the proposed sale, and all offers made and received on either hand were made with reference to such stereotype plates and printed stock, and it was understood by all parties, that, if such sale were consummated, the copyrights should be "thrown in," without additional charge.

The answer also admits, that, in republishing volumes 32 to 38 the defendants have used the opinions of the Supreme Court of Illinois as published by the plaintiff; but avers that they have corrected errors in names, citations, and other matters therein, and denies that they have prepared the books from those of the plaintiff, or used the work of the plaintiff, except in so far as plaintiff's books are free to the use of any and all persons, or have copied his title-pages, or have used his paging, or have copied his tables of cases cited or reported, or the stipulations, errors assigned, or instructions given. It avers that the statements of cases and syllabuses in the volumes as republished by the defendants are wholly original and entirely different from and unlike those of the plaintiff, except in the few instances where there is an apparent resemblance, owing to the fact that those of the defendants have been drawn from the opinions of the court, and those of the plaintiff in the same cases appear to have been drawn from the same source; and that the volumes so republished by the defendants contain large amounts of new, original, and valuable matter, prepared expressly for those volumes, and not contained in any of the volumes of the plaintiff. It admits that the defendants have under consideration the republication of volumes 39 to 46. It also avers, that, for many years before the filing of the bill, the plaintiff had abandoned volumes 32 to 38; that his stereotype plates and stock of those volumes were destroyed in October, 1871, and none of them were ever reproduced by him until about July or August, 1877, when he reprinted volumes 37 and 38; that, prior thereto, he had for many years repeatedly announced that he should never reproduce those volumes; that, more than a year before the filing of the bill, the defendants noti-

fied the plaintiff of their intention to republish volumes 32 to 38, and frequently thereafter notified him of such intention, and publicly announced the same by advertisement, and from time to time, as such republication progressed, during the spring and summer of 1877, notified him of the progress of the work, and, as the volumes appeared from time to time during the spring and summer of 1877, the plaintiff was constantly apprised thereof, and at divers times during that year, and before, the defendants received various propositions from the plaintiff for an exchange of volumes 32 to 38, so being republished, for volumes 39 to 46, which the plaintiff had for sale; that the plaintiff, down to the filing of the bill, never objected to such republication, but always appeared to acquiesce therein, and encouraged the defendants to proceed therewith, and, from his conduct during such period, the defendants always believed, down to the filing of the bill, that such republication was being done with his acquiescence and consent; and that the plaintiff, by his conduct, is estopped from receiving the relief asked. The answer also denies all the material allegations of the bill.

Ewell and Denslow each put in an answer, disclaiming all interest in the publication of any volumes of the reports by Callaghan & Co., and all interest in such volumes.

Issue was joined and proofs were taken, and, on the 10th of February, 1881, the Circuit Court entered an interlocutory decree, finding that the plaintiff was the owner of the copyright or exclusive right of publication of volumes 32 to 38; and that Callaghan & Co. had violated such copyright by publishing, offering for sale, and selling copies of said seven volumes, and Ewell and Denslow by editing the same. The decree awarded a perpetual injunction against all of the defendants from further publishing or selling, or transferring or removing any of said books, and ordered a reference to a master, Henry W. Bishop, to ascertain and report what number of each of the volumes had been printed, and what number sold, and at what prices; and directed that the members of the firm of Callaghan & Co. might be examined in regard thereto, and might be required to produce their account books

and papers, and that the master ascertain and report what was the market value of each of the books of the plaintiff prior to the illegal publication by the defendants, and what was the actual cost or value of reprinting and binding each of the volumes, and that, upon the making of the report, the plaintiff. might apply for a further order in regard to the damages to be allowed to him for the illegal publication and sale of the volumes. The decree also gave leave to the plaintiff to file a supplemental bill, based on the fact that, since the filing of the original bill, Callaghan & Co. had proceeded to publish and sell copies of the books described in the bill as volumes 39 and 41 to 46.

The decision of the Circuit Court is reported in 10 Bissell, 139, and 5 Fed. Rep. 726. The ruling of the court was (1) that the volumes of reports were the proper subject of a copyright under the act of Congress, for at least what was the work of the mind and hand of the reporter, namely, the headnotes, and the statements of facts and of the arguments of counsel, notwithstanding he could have no copyright in the opinions of the court; (2) that there had been a compliance with the act of Congress in the procurement of the several copyrights; (3) that the defendants had, in preparing volumes 32 to 38, used the volumes of the plaintiff so as to interfere with his copyright; (4) that he had not consented to the publications made by the defendants, or abandoned his rights by acquiescence, laches, or otherwise.

On the 14th of February, 1881, the plaintiff filed a supplemental bill against the same defendants, reciting the material allegations of the original bill, and averring that since it was filed the defendants had published and sold large numbers of volumes 39 and 41 to 46, and were threatening to publish volume 40; that, in the volumes they had published, they had used the plaintiff's volumes, and had copied his arrangement or division into volumes of the matter contained in his volumes, and had copied his whole arrangement of each of them, and had used each of them to make, and had made, their books an imitation and copies of his books, and had advertised and sold their books as the same books as his, and had not

resorted to the records for the opinions and other matter contained in their books, but had copied the same from his books, using and copying considerable portions of the original matter furnished by Mr. Freeman, in some instances copying exactly, and in others making merely colorable changes; that, before any of the publications of the defendants were made, the plaintiff had advertised his books extensively; that the decisions of the Supreme Court of Illinois, as divided by the plaintiff into volumes, had, by reason of what was done by him, become known by the name which had been applied to the classification so made by the plaintiff; that such division was the property of the plaintiff, and was valuable, and was covered and protected by his copyright; that the defendants had copied the title or name of each of the books; that each of the books of the defendants was made to supersede and take the place of one of the books of the plaintiff, of corresponding number; and that they were being so sold to his great damage.

The supplemental bill waives an answer on oath, and prays for a perpetual injunction restraining the defendants from publishing, selling, offering for sale, or removing beyond the jurisdiction of the court, any of said books, and for a decree that they pay to the plaintiff all his damages by reason of such publication and sale.

On the 18th of February, 1881, the members of the firm of Callaghan & Co. filed a cross-bill in the same court against Myers, reciting the proceedings on the original bill and the terms of the interlocutory decree of February 10, 1881. It averred that the discovery and accounting provided for thereby were in progress before the master, Mr. Bishop; that Bernard Callaghan, one of the firm, had been partially examined concerning the number of volumes printed by Callaghan & Co., and on hand, and had already been required to produce before the master, for the examination of Myers and his counsel, books and papers of Callaghan & Co., relating to the volumes and the number thereof printed; that such examination was still progressing; that Callaghan & Co. had in their possession certain copies of volumes 32 to 38, and Myers claimed that he was entitled to a forfeiture of the

same and a delivery thereof; that Myers, on the 11th of February, 1881, brought an action of replevin against Callaghan & Co., to recover those copies; that the writ was in the hands of the marshal for service; that Myers was ignorant of the precise number and whereabouts of the copies, but as soon as the examination and discovery then progressing before the master should have disclosed the number and location of the copies, Myers would instruct the marshal to seize them under the writ; that Myers was not entitled to any discovery from Callaghan & Co. in aid of his proceedings for a forfeiture of the copies; that Myers, having taken the decree for a discovery as to the copies, and having obtained a discovery thereunder, and having acquiesced in the publication of the volumes by the defendants, was estopped in equity from claiming any forfeiture or recovery of any of the copies; and that such decree, and the examination and discovery before the master, amounted to a waiver of the forfeiture or recovery by Myers.

The cross-bill waived an answer on oath, and prayed for a perpetual injunction to restrain Myers from further proceeding with the action of replevin, and from instituting any further action for the forfeiture or recovery from Callaghan & Co. of any copies of volumes 32 to 38, and for an injunction to that effect *pendente lite*.

Myers answered the cross-bill, setting forth the interlocutory decree made in the original suit, and admitting that he claimed that the volumes in the possession of Callaghan & Co. became forfeited to him under the act of Congress, and alleging that the interlocutory decree did not provide for a discovery or an accounting, and that he was not seeking any discovery from Callaghan & Co., for the purpose of aiding him in procuring the possession of the books; that the volumes were not published by Callaghan & Co. with his knowledge, acquiescence, or consent; that he claimed the benefit of the forfeiture provided for by § 99 of the act of July 8, 1870, c. 230, 16 Stat. 214 (now § 4964 of the Revised Statutes); and that he had done nothing to waive or abandon the right given to him by that statute. A replication was filed to this answer.

The members of the firm of Callaghan & Co. filed an answer to the supplemental bill on the 22d of June, 1881. It admitted that the firm had published and sold volumes 39 and 41 to 46, and denied that in publishing those volumes they had made any other use of the plaintiff's volumes than such fair and legitimate use, by way of reference, consultation, and otherwise, as might be made of any previous publication by a succeeding author or compiler treating of the same subject, and denied that they had copied the plaintiff's arrangement or division of matter, other than that the cases reported in the defendants' volumes followed each other in the same order as in the plaintiff's volumes, and denied that they had used the plaintiff's volumes to make their books an imitation or copies of them, or that their books had been made in imitation of those of the plaintiff. They denied that they had advertised or sold their books as the same books as those of the plaintiff; but admitted that they had used the name "Freeman's Reports" in their catalogues and circulars, and averred that such use was in accordance with the uniform usage of law publishers, in indicating volumes of law reports by the name of the original reporter, and with no intention of announcing the volumes of the defendants as those of the plaintiff; that, as appeared by their catalogues and circulars, the defendants, by a note immediately following the words "Freeman's Reports," directed attention to the fact that the volumes of the defendants were a different, revised, and re-edited edition, and were all re-reported and edited by persons other than Mr. Freeman, whose names were stated in the note; that the plaintiff had no property in the name "Freeman's Reports," yet, as soon as the supplemental bill was filed, the defendants desisted from such use of the words "Freeman's Reports," and had corrected their catalogues and circulars by changing the words "Freeman's Reports" to "Illinois Reports;" and that, although they had used the words "Freeman's Reports" in the manner described for several years prior to the filing of the supplemental bill, the plaintiff had not objected thereto prior to that time.

The answer admitted that the defendants, in making their

books, had taken the opinions of the court from the volumes as reported by Mr. Freeman, but stated that in all cases they had carefully compared each of the opinions with the original opinions of the court, on file or recorded in the respective cases, and had made frequent corrections therein, to correspond with the originals; and that, except as to such use of the opinions, the remaining matter in the volumes of the defendants was obtained from the original records of the court, and was arranged, reported, compiled, and edited wholly by the original labor of the editors employed by the defendants for that purpose, and whose names appeared as such editors on the title-page and cover of each of the volumes of the defendants. It also averred that the titles of the volumes of the defendants were so different from those claimed by the plaintiff that they could not be mistaken therefor even by a casual purchaser or observer; and that the volumes of the defendants were new and original productions, with new and original tables of cases, head-notes, statements of facts, abstracts of briefs of counsel, corrected opinions, foot-notes, and indexes, and were in no manner copies of, or infringements upon, the volumes of the plaintiff. It also averred that the plaintiff could not have, under the acts of Congress or otherwise, any exclusive right in the opinions of the court, as published, or in their arrangement or division, or in the titles of the volumes. The answer also denied all the material allegations of the supplemental bill. A replication was filed to this answer.

Ewell and Denslow answered the supplemental bill by an answer disclaiming all interest in the publication of the volumes named in the supplemental bill, and all interest in those volumes.

On the 2d of January, 1883, Myers amended his supplemental bill by averring that the defendants had infringed his copyright by reprinting and publishing volume 40. An answer was put in to such amendment, and a replication to that answer.

Proofs were taken as to the supplemental bill, and on the 3d of March, 1884, the court made an interlocutory decree, that the plaintiff was the owner of the copyright and of the exclu-

sive right of publication of volumes 39 to 46; that the defendants had in some particulars infringed said copyrights; and that the plaintiff recover the profits received or made or accrued therefrom; and referring it to John I. Bennett, a master, to report such profits; and directing that the defendants might be examined in relation thereto, and might be required to produce before the master their books of account and papers relating to the publication and sale of such volumes, and that the master should report also the damages.

The decision of the court is found in 20 Fed. Rep. 441. The only question considered in the decision was that of infringement. The court held that in some respects in each case the Freeman volume had been used by the defendants, in the headnotes, the statements of facts, and the arguments of counsel.

On the 17th of April, 1882, the master, Mr. Bishop, reported that the defendants had printed 4313 of volumes 32 to 38, and had sold 2909 of the same, the amount of the sales of the several volumes being as follows: Volume 32, $1990.91; 33, $1971.73; 34, $1884.24; 35, $1945.09; 36, $1933.47; 37, $1878.68; 38, $1847.07; being a total of $13,451.19, and an average of $4.62½ per volume. He stated that no testimony had been offered as to the market value of the volumes before publication by the defendants. He also reported the cost or value of reprinting and binding the several volumes to be as follows: Volume 32, $942.88; 33, $782.35; 34, $664.13; 35, $843.50; 36, $835.97; 37, $773.18; 38, $885.78; making a total of $5727.79, not including the item of proof-reading or the item of expense of selling, or a charge for stereotyping. The defendants excepted to this report because the master had not allowed to the defendants the amount paid by them for proof-reading and editorial work on the volumes, or for stereotyping. The court, on a hearing on the report and exceptions, referred the cause back to the master, Mr. Bishop, to ascertain and report, on the evidence given and on further evidence, the total amount of the damages sustained by the plaintiff in consequence of the illegal publication and sale.

Mr. Bishop made a second report, on the 2d of February, 1884, on the previous proofs and on new testimony. He

again reported the total number of copies printed of volumes 32 to 38 to have been 4313, and the total number of them sold to have been 2909. He reported the amount of sales, as before, by items, making a total of $13,451.19, and an average of $4.62½ per volume. Excluding charges for stereotyping, counsel fees, editorial work, and proof-reading, and including 12⅞ per cent of the gross sales as a legitimate item of expense in conducting the business of the defendants in the course of the publications, he reported the cost of reprinting and binding the several volumes to have been as follows: Volume 32, $1064.25; 33, $883.06; 34, $749.63; 35, $952.10; 36, $943.59; 37, $872.70; 38, $999.81; making the total cost of reprinting, binding, and disposing of the volumes, $6465.14. Deducting that from the $13,451.19 left a balance of $6986.05, which he reported as the damages sustained by the plaintiff by reason of the illegal sale and publication.

The plaintiff filed sundry exceptions to the second report of Mr. Bishop, and the defendants filed three exceptions to it. The first exception of the defendants was, that the master had not allowed them credit for the cost of stereotyping; the second, that he had not allowed, as part of the expenses of conducting the business of the defendants, salaries paid to them for their services, the same amounting to about $12,000 a year; the third, that he had allowed to them only 12⅞ per cent of their gross sales as expenses incurred in effecting such sales, and had not allowed the salaries as a part of such expenses, whereas he should have allowed credit to them, on account of such expenses, for such additional percentage, over and above 12⅞ per cent, as the amount of such annual salaries bore to the gross annual sales during the period in question.

On the 24th of October, 1884, the master, Mr. Bennett, filed his report, finding that the defendants had disposed of 2292 copies of volumes 39 to 46. He stated that the plaintiff claimed that 156 more volumes had been sold, making 2448 in all. The 156 volumes were volumes which, after being originally sold by the defendants, had again come to their hands, and been resold once or oftener. The master disallowed these resales, but reported that, if they were to be allowed, the sum

of $696.38 should be added as damages for such resales. He reported the average sale price of the volumes, received by the defendants, to have been $4.464, making a total sale price of $10,231.48. He reported that the cost of all the volumes sold was $4679.55; that the defendants were entitled to a credit of $1118.49, on account of the general expenses of conducting their business, being 12 per cent of their gross sales; that the total cost of producing the volumes sold was $5798.04; and that, deducting that amount from the $10,231.48, left $4433.44 as the total amount of net receipts from sales, or damages to the plaintiff.

The plaintiff excepted, by his first and second exceptions, to the disallowance in respect of the 156 copies resold, and filed other exceptions. The defendants filed exceptions in regard to the number of volumes sold, the number of volumes on hand, the average price of the sales, the total gross receipts from the sales, the cost of the volumes sold, the amount of the credit for general expenses of conducting their business, the net receipts from the sales, the refusal of the master to allow them credit for the cost of producing the volumes unsold and remaining on hand, or credit for the sum expended by them for editorial work in preparing the volumes, or credit for the amount expended by them in stereotyping the volumes, or credit for the amount paid them as compensation for their services, or credit on account of sundry other matters.

The court, on a hearing on the reports of the masters and the exceptions thereto, sustained the first and second exceptions of the plaintiff to the report of the master, Mr. Bennett, and overruled all the other exceptions of both parties to both of the reports.

On the 9th of July, 1885, a final decree was entered, adjudging that the plaintiff recover $340.70, as profits on the resales of the 156 volumes, in addition to the $4433.44 reported by the master, Mr. Bennett, and the $6986.05 reported by the master, Mr. Bishop, the three sums amounting to $11,760.19, and the costs of the suit. The decree granted a perpetual injunction as to volumes 32 to 46. It also restrained the defendants from selling or disposing of the stereotype plates of those

volumes; and dismissed the bill as to Denslow and Ewell, without costs. It further adjudged that the right of the plaintiff to recover the additional sum of $896.19, as claimed by the plaintiff and referred to in the second report of the master, Mr. Bishop, in case the cost of composition and press-work should be ratably distributed over the whole edition printed of volumes 32 to 38, and also the rights of all parties under the cross-bill, and the rights of all parties to the said action of replevin for the unsold copies of volumes 32 to 38, be reserved for determination on the hearing of the cross-bill.

The report of the decision of the Circuit Court on the exceptions to the reports of the masters is found in 24 Fed. Rep. 636.

From such final decree, the defendants composing the firm of Callaghan & Co. have appealed to this court.

*Mr. J. L. High* for appellants.

I. Law reports are public property; are not susceptible of private ownership; and are not the subject of copyright under the act of Congress.

The framers of the Constitution plainly had in view the necessity of affording protection to the literary productions of private authors, and never intended that by virtue of such legislation a public officer could claim private dominion and ownership, or assert a monopoly in the result of his official labors, for which he was employed and paid by the State. Mr. Freeman, in the preparation of his reports, was not an author within the meaning of this Constitutional provision.

It was decided by this court in *Wheaton* v. *Peters*, 8 Pet. 591, and is now universally conceded, that the opinions of the judges are public property, and not the subject of copyright by the reporter. This necessarily results from the relation sustained by the judges toward the people, they being public officers employed and paid to render a purely public service. The result of the labors of the judges is, therefore, the property of the people by whom and for whom they are employed; and if any such element of literary property attaches to their labors as to render them susceptible of copyright, the people

alone are entitled to such copyright. In like manner the reporter being a public servant or agent, the product of his labor is likewise the property of the people; and if copyrighted at all, it can only be done in the name of, and for the benefit of the people.

The case of *Wheaton* v. *Peters* has been supposed to recognize the right of an official reporter to literary property in his work. Whether the court in *Wheaton* v. *Peters* intended to decide that Mr. Wheaton was entitled to a copyright in his reports, is not easily determined. The opinion itself contains no allusion to this point; and the case was remanded to determine whether there had been a compliance with the statutory provisions requisite to a valid copyright, such as the publication of the notice required by the act of Congress of 1790, and the delivery of a copy of the book to the Secretary of State. A dictum of Mr. Justice Story, (who was a member of the court when *Wheaton* v. *Peters* was decided,) in *Gray* v. *Russell*, 1 Story, 11, may be cited as affording some ground for believing that the judgment in *Wheaton* v. *Peters* was intended as a recognition of the reporter's right to a copyright. On the other hand, we have the contemporaneous testimony of Mr. Peters himself, in the report of the case, that the court gave no opinion on the point, and did not consider it when the case was disposed of. 8 Pet. 618, *n.* See also *Heine* v. *Appleton*, 4 Blatchford, 125.

There is a series of English decisions, having a strong bearing, by analogy, upon this question. The publication of the laws, as such, in England has always been claimed as an attribute of sovereignty, and the exclusive right to publish them was formerly granted by letters patent from the crown. These patents were granted at an early date. In the *Company of Stationers* v. *Seymour*, 1 Mod. 256, decided in 1677, the court say: "And particularly the sole printing of law books has been formerly granted in other reigns. . . . Queen Elizabeth, King James and King Charles the First granted such patents as these, and the law has great respect to common usage." The early English cases under these letters patent afford strong support for the position that the laws

are .not private property, and are not susceptible of private ownership, the right to their publication resting in the sovereign.   See *The Stationers* v. *The Patentees about the printing of Rolls' Abridgment*, Carter, 89 ; *S. C.* Bac. Abridg. tit. Prerogative, F. 5 ; *Millar* v. *Taylor*, 4 Burrow, 2304, 2383 ; *Basket* v. *University of Cambridge*, 1 W. Bl. 105 ; *Manners* v. *Blair*, 3 Bligh (N. S.), 391.

Whether the theory of the royal prerogative, or of a private property in the crown be accepted, in either event the sole right of publication is recognized in the sovereign, and in either event the analogy is equally striking in the case at bar. If the right of publishing the laws in England pertained to the sovereign power, then *a fortiori* does it pertain to the sovereignty here ; that is to the public, to the people, or to their government, and no element of private literary property can attach to such publications.   And if, as in this case, appellants as private citizens are asserting the right to publish the laws of the State, the State alone can complain.

It is true that while publishing volumes 32 to 46 the reporter received no direct salary from the State.   Under provisions of law, the State purchased of him a large number of copies of those volumes at a price affording a large profit on each, which was equivalent to a salary.   But it is confidently submitted that the nature of the reporter's functions, and the question of copyright in his reports, are wholly independent of the method by which he receives compensation for his services, or whether, indeed, he is compensated at all.   Private citizens are frequently designated to the performance of public duties, without compensation, and in the performance of such duties they may, and do, make written reports of their proceedings for the benefit of the State.   It has never yet been asserted that such reports are the private literary property of the persons by whom they are made.   The sole test in determining the right of private dominion and ownership in literary productions is, whether the writer is engaged in a private enterprise, and therefore an author within the meaning of the Constitution, or whether he is engaged in a public service, which dedicates the result of his labors to the public.

The doctrine of exclusive literary ownership in law reports contended for by appellee is also contrary to public policy. The decisions of the Supreme Court of Illinois are part of the law of the land. The reports of those decisions by the official reporter are made by statute evidence of the law. They are, therefore, publications of the laws of the State, in like manner as are the published statutes and acts of the legislature.

II. The appellee is not entitled to relief, because of non-compliance with the conditions of the act of February 3, 1831, 4 Stat. 436, which were in force when the original editions of volumes 32 to 46 were published. The second error assigned is based upon the entire failure of appellee to prove any date of publication of any of the volumes, the absence of any competent proof as to the date of depositing any of the volumes with the clerk of the District Court, the failure to prove that the printed title was filed with the clerk in advance of publication, and the failure to prove the deposit of the printed volumes within three months after publication.

The third assignment of error specially challenges the proof admitted by the Circuit Court, as to the date of the deposit of the printed volumes with the clerk. The only proof offered by appellee upon this point consists of a mere memorandum at the bottom of each of the clerk's certificates concerning the filing of the printed title. The memorandum as to the alleged deposit of volume 32 may be taken as a sample of them all. It appears at the bottom of the certificate, following the signature and official seal of the clerk, certifying the transcript of his record as to the filing of the printed title, and is in these words: "Work deposited Jany. 17, 1866, Wm. H. Bradley, Clk." There is no certificate by the clerk that the book was deposited on that or any other day, and indeed, under the act of Congress of 1831, such a certificate by the clerk would have been wholly gratuitous, and would have afforded no competent proof as to the fact in question. The memorandum is not attested by the official seal of the clerk, nor was any proof offered as to the genuineness of the signature purporting to be that of the clerk. Even if this signature had been proven to be that of the clerk, the memorandum would still have been

incompetent, being at the most a mere letter or written statement by the clerk, with no opportunity afforded to appellants for cross-examination. To the introduction of these memoranda we objected, upon the ground that they constituted no part of the clerk's certificates, but were merely anonymous statements, without proof as to when, or by whom they were made, and that they were, therefore, wholly incompetent to show the date of the deposit of the volumes. Our objection was, overruled, and exception was duly taken.

The fourth and fifth assignments of error relate to the refusal of the Circuit Court to admit the testimony offered by appellants as to the date of the publication of these volumes, showing conclusively that, as to them, appellee failed to comply with the conditions of the act of Congress.

The sixth assignment of error pertains to the relief granted as to volumes 35 and 36. By the clerk's certificate, offered by appellee as to volume 35, it appears that the printed title was deposited with the clerk of the District Court, January 28, 1867. The act of Congress then in force, like the present statute, required a notice of the entry of the copyright to be printed, either on the title-page of the volume, when published, or on the succeeding page. The printed notice, which appears on the back of the title-page of volume 35 of the original edition as published, purports to show its entry in the year 1866, being in the following words: "Entered according to act of Congress in the year 1866." There is, therefore, a variance of a year in the filing of the title, as shown by the clerk's certificate, and in the announcement of the fact, as shown in the printed notice on the reverse of the title-page. As to volume 36, the clerk's certificate shows that the printed title was filed by E. B. Myers and Chandler, while the printed notice on the reverse of the title-page of the volume as published purports to show that the entry was made by E. B. Myers alone. These departures from a compliance with the requirements of the statute are fatal. The uniform current of authority, both English and American, is that the conditions imposed by the statute are indispensable to the creation of a copyright, and that a strict performance of these condi-

.tions is absolutely necessary to the existence of any literary property in the published work, and of any right of action for an infringement. *Wheaton* v. *Peters*, 8 Pet. 591; *Merrell* v. *Tice*, 104 U. S. 557; *Murray* v. *Bogue*, 1 Drewry, 353; *Jollie* v. *Jaques*, 1 Blatchford, 618; *Baker* v. *Taylor*, 2 Blatchford, 82; *Struve* v. *Schwedler*, 4 Blatchford, 23; *Parkinson* v. *Laselle*, 3 Sawyer, 330.

.The learned judge of the Circuit Court, in passing upon these objections gave as his reason for refusing to follow the general current of authority on this point, that there was still an inherent or natural property right in the author. This theory no longer prevails in the courts, and the author must look only to the statute for his protection, and must show a strict compliance with all its requirements. Tested by ordinary rules of property, and by ordinary standards of right and wrong, the "natural property theory" is well founded and should receive the sanction of the courts. It was so held in the great case of *Millar* v. *Taylor*, 4 Burrow, 2303, in 1769, and the opinion of Lord Mansfield in that case remains as a most masterly exposition of the natural right of the author to his literary product, independent of the statute of Anne. But in the case of *Donaldsons* v. *Becket*, 4 Burrow, 2408, decided in 1774, the House of Lords overruled the doctrine of *Millar* v. *Taylor*, five of the law lords being of the opinion that the statute of Anne did not deprive the author of his common law right, while six held that the common law right, after publication, was taken away by the statute, and that the author must look to the statute alone for protection. It is a well-known historical fact that Lord Mansfield refrained from voting upon the question in the House of Lords from motives of delicacy, and that his vote, if given, would have left the law lords equally divided upon this question, thereby affirming the doctrine of *Millar* v. *Taylor*. Upon this slender margin, therefore, the doctrine was established by the House of Lords, that the natural property right of the author, after publication, is wholly lost, and that he must look to the statute alone for protection. This doctrine has ever since remained unshaken in England, and it received the express sanction of this court in

*Wheaton* v. *Peters*, and has ever since been followed in this country. We are, therefore, no longer dealing with abstract questions of literary property, or with any ethical considerations as to the dominion of the author over the product of his own brain. We are merely dealing with questions of statutory construction, which have long since been determined by the highest judicial tribunals of England and America. And because of the absolute failure of appellee to prove such compliance with the conditions prescribed by the act of 1831, the decree should be reversed.

III. Appellee wholly failed to prove title to any of the volumes, as averred in his bill.

IV. The decree should be reversed, because of appellee's acquiescence in the publication of the volumes, and because of his laches in seeking relief.

In view of the entire course of conduct on the part of Myers, embracing not merely a tacit acquiescence in the Callaghans' publication, but affirmative aid and active encouragement, until they had embarked a large amount of capital in their enterprise; and in view of his unpardonable and unaccountable laches and delay for a period of many months before invoking the aid of the court, it is submitted that he is estopped by his own conduct from the relief sought by his bill, and that the decree should be reversed. And in support of this proposition, the attention of the court is directed to the following authorities: *Saunders* v. *Smith*, 3 Myl. & Cr. 711; *Beard* v. *Turner*, 13 Law Times (N. S.), 746; *Lewis* v. *Chapman*, 3 Beavan, 133; *Tinsley* v. *Lacy*, 1 Hem. & Mil. 747; *Rundell* v. *Murray*, Jacobs, 311; *Hill* v. *Epley*, 31 Penn. St. 331; *Webb* v. *Powers*, 2 Woodb. & Min. 497, 523; *Platt* v. *Button*, 19 Ves. 447; *Baily* v. *Taylor*, 1 Tamlyn, 295.

V. The appellants' volumes did not infringe the copyrights of the original editions. The evidence shows that the syllabuses were prepared from the opinions by independent work. As regards the statements of fact preceding the opinions of the court, in the Callaghan edition, it is to be observed, first, that in very many cases they are wholly omitted, for the reason stated by Mr. Ewell, that the opinions of the court

frequently state the facts with sufficient clearness. In other cases, where any use has been made of Freeman's statements of fact by appellants' editors, they have simply abridged them, presenting the result in a clearer and more condensed form. And the doctrine is well established that an abridgment is not a piracy. *Hawkesworth* v. *Newberry*, Lofft, 775; *Gyles* v. *Wilcox*, 2 Atk. 141; *Wilkins* v. *Aikin*, 17 Ves. 422; *Folsom* v. *Marsh*, 2 Story, 100, 107; *Story's Ex'rs* v. *Holcombe*, 4 McLean, 306; *Stowe* v. *Thomas*, 2 Wall. Jr. 547.

But it will be insisted by appellee that we have infringed his pretended copyrights by taking the opinions of the judges from his volumes, instead of from the records of the court. It is sufficient to say that there can be no copyright in the labors of the judges. *Wheaton* v. *Peters*, 8 Pet. 591; *Gray* v. *Russell*, 1 Story, 11.

If it be claimed that the appellee is entitled to the exclusive right to the arrangement of each of his volumes, to the division of opinions into separate volumes, to the arrangement of the decisions as accompanied with the head-notes, etc., and to the arrangement of the pages of his volume, we answer that such an arrangement is as old as the system of law-reporting, and that a claim of literary property in it is idle.

As regards the division of the cases into volumes, and the order in which the cases follow each other in the several volumes, the most casual inspection of the Freeman edition discloses an entire absence of method in such division and arrangement, plainly demonstrating that chance, and chance only, governed in selecting the cases for the different volumes, as well as in determining their relative position in the several volumes.

The paging of the Freeman edition is equally wanting in any element of literary property, originality or exclusive ownership. Ever since the invention of printing, books have been paged in numerical order, and appellee might with equal propriety claim an exclusive property in the system of Arabic numerals as in the paging of his books. Moreover, the printed paging is merely the mechanical labor of the printer, and is never performed by the author or publisher.

The claim of copyright in the title to the Freeman volumes may be dismissed with two suggestions: (1) We have not copied the title of the Freeman edition. An examination of the title-pages of each of appellants' volumes will show that they are totally different from those of the corresponding Freeman volumes. (2) The title of a published work is not the subject of copyright, being a mere appendage or description which is not within the meaning of the act of Congress. *Jollie* v. *Jaques*, 1 Blatchford, 618 ; *Osgood* v. *Allen*, 1 Holmes, 185 ; Drone on Copyright, 145.

VI. Appellants were compelled to make discovery in aid of the forfeiture sought by appellee.

By a uniform current of authority, English and American, the doctrine is too firmly established to be longer challenged, that equity will never compel a discovery in aid of penalties or forfeitures, unless the right to such penalties or forfeitures is waived by the person seeking the discovery. Story's Equity Pleadings, §§ 521, 575, and 576; Story's Equity Jurisprudence, § 1494 ; Mitford's Equity Pleadings, pp. 186, 193 to 198; Wigram on Discovery, pp. 62, 150 and 195 ; 1 Daniell Ch. Pr. 563 ; Drone on Copyright, 534 ; *United States* v. *Saline Bank of Virginia*, 1 Pet. 100; *Atwill* v. *Ferrett*, 2 Blatchford, 39; *Johnson* v. *Donaldson*, 18 Blatchford, 287 ; *S. C.* 3 Fed. Rep. 22; *Chapman* v. *Ferry*, 12 Fed. Rep. 693 ; *Bird* v. *Hardwicke*, 1 Vernon, 109, and note ; *Colburn* v. *Simms*, 2 Hare, 543 ; *Attorney General* v. *Lucas*, 2 Hare, 566 ; *Chauncey* v. *Tahourden*, 2 Atk. 392.

VII. The damages were excessive.

(1) The court erred in disallowing credit for stereotyping. It is not the province of the court upon an accounting of this nature to reduce the legitimate expenditures incurred by appellants in producing their volumes to the lowest possible point, or to exclude any reasonable and proper elements of expenditure which entered into the production of their books. The true scope of the inquiry is, what reasonable expenses were incurred by appellants in the production of their volumes, in accordance with the usages and customs of the trade in the art of book-making as then existing. Their books being

produced in the usual manner customary in such publications, and in the same general style and appearance as other law reports, all legitimate expenditures incurred in such production should be allowed. If the cost of stereotyping is to be excluded, the court may, with equal propriety, reduce the cost of paper and binding, since a much cheaper article of paper and cheaper binding could have been employed, and still have rendered the books marketable. The true test, therefore, in measuring the expenditures which should be allowed to appellants as the cost of producing their volumes, is such reasonable expenditure as was customary and usual in the production of like publications during the period in controversy.

(2) Appellants' salaries should have been allowed as part of the expense of conducting their business.

It is not disputed that the services of appellants were rendered; that they conduced to the success of their business and to the large sale of these books; that without such services, other and equally competent men must have been employed to do the same work, and it is also undisputed in the entire record, save only in the report of Mr. Bennett, that no profits were ever divided by the firm. The case is therefore brought directly within the doctrine of the *Rubber Company* v. *Goodyear*, 9 Wall. 788, the only distinction being that in that case the salaries allowed were paid to the managing officers of an infringing corporation, instead of to the members of a partnership, as here.

(3) There was error as to the number of copies sold.

(4) There was error as to the selling price of the volumes.

(5) The court erred in distributing the cost of production over the volumes sold and unsold.

(6) There were no net receipts or profits on sales of volumes 39 to 46.

(7) The court erred in refusing credit to appellants for editorial work on their volumes. Hundreds of cases, as originally reported by Mr. Freeman, contain no statement of facts, or argument of counsel, the opinion being simply prefaced with the statement that the facts are stated in the opinion.

The corresponding cases in the Callaghan edition, as edited by Mr. Denslow, contain elaborate statements of facts, and copious abstracts of the arguments of counsel. Elaborate foot-notes are also added with references to other cases in Illinois and elsewhere upon the topic under consideration in the given case. All this work, it is conceded, was original and independent labor on the part of Mr. Denslow. It was not copied from the Freeman edition, and it is not in that edition. The editorial work thus put upon these volumes includes the proof-reading, which is itself an important item, and as necessary to the production of the manufactured product as are composition, press work or binding. The proofs of a volume of law reports must be read by a skilful lawyer with some experience in work of this nature, or the result will be a bungling and unmarketable production, in fact a mere comedy of errors. And every objection which is urged against the allowance of the cost of editorial work and proof-reading may be urged with equal and even greater propriety against the mere mechanical labor of composition, press work and binding.

(8) As to the 156 copies of resales, the appellants were not chargeable for them.

When we have once paid the penalty of the original transgression, by the accounting for the first sales, the volumes so sold are, by virtue of such accounting, freed from the monopoly of appellee's alleged copyright, and become common property. The decree for the accounting, in other words, operates precisely as a license to sell upon a fixed royalty. The recovery for the original sales satisfies the monopoly claimed by appellee under the act of Congress, and forever frees the volumes from any further claim upon his part. The decree fixing damages for the original sales puts us precisely in the attitude of purchasers of the volumes in question. They then become our absolute property, to be sold and resold for all time to come. When, therefore, appellants account for the original sales of their edition, repurchase the volumes in the market, and sell them at second-hand, or when they purchase from appellee copies of his own edition, or purchase them at second-hand from other parties, and sell them to their customers, the vol-

umes are, by the accounting in the one case and by the purchase in the other, freed from the monopoly of the copyright, and may be sold and resold without further liability. *Perrigo* v. *Spaulding*, 13 Blatchford, 359 ; *Adams* v. *Burke*, 17 Wall. 453.

Nor is it any answer to say that a resale by appellants of second-hand copies of their edition is as injurious to appellee as the original sale, because it supplies a demand that would otherwise be supplied by him. This argument, if well founded, would apply with equal force to resales by appellants or by other persons, of second-hand copies of Myers' own volumes.

*Mr. George W. Kretzinger* for appellee.

MR. JUSTICE BLATCHFORD, after stating the case, delivered the opinion of the court.

The volumes of law reports of which the plaintiff claims a copyright are in the usual form of such works. Each volume consists of a title-page, of a statement of the entry of copyright, of a list of the judges composing the court, of a table of the cases reported in the volume, in alphabetical order, of a head-note or syllabus to each opinion, with the names of the respective counsel, and their arguments in some cases, and a statement of facts, sometimes embodied in the opinion and sometimes preceding it, and of an index, arranged alphabetically, and consisting substantially of a reproduction of the head-notes. Of this matter, all but the opinions of the court and what is contained in those opinions is the work of the reporter and the result of intellectual labor on his part.

The broad proposition is contended for by the defendants, that these law reports are public property, and are not susceptible of private ownership, and cannot be the subject of copyright under the legislation of Congress. It is urged that Mr. Freeman, the reporter, was a public officer, whose office was created by chapter 29 of the Revised Statutes of Illinois of 1845, which enacted as follows, in regard to the Supreme Court and the reporter :

"Sec. 20. The court shall appoint some person learned in the law to minute down and make report of all the principal matters, drawn out at length, with the opinion of the court, in all such cases as may be tried before the said court; and the said reporter shall have a right to use the original written opinion after it shall have been recorded by the clerk.

"Sec. 21. The reporter, before entering upon his duties, shall be sworn by some one of the justices of the Supreme Court faithfully to perform the duties of his said office. He may, for misconduct in office, neglect of duty, incompetency, or other cause shown, to be entered of record, be removed from office.

"Sec. 22. It shall be the duty of the reporter to deliver to the Secretary of State, as soon as convenient after publication, such number of copies of the respective volumes of the reports of said court as may be necessary to enable the said secretary to distribute the same in the manner provided in the following section, together with one hundred copies in addition, to be deposited in the secretary's office for the use of the State."

Section 23 provided for the distribution of the volumes by the Secretary of State, and § 24 provided, that, upon the delivery of the requisite number of any volume, the Secretary of State should deliver to the reporter a certificate specifying the number of copies which had been so delivered, and that such certificate should entitle the reporter to a warrant drawn by the auditor of public accounts upon the treasury for an amount, for those volumes, at the price for which the books should be sold to individuals, provided the price should not exceed the ordinary price of law books of the same description, to be determined by the auditor, treasurer and Secretary of State. These statutory provisions were amended in 1863, by making the term of office of the reporter six years, and in 1865 it was enacted that the price of the volumes to be delivered to the Secretary of State should be $6 each. The reporter was given a salary, by law, in 1877, of $6000 a year.

It is further contended, that Mr. Freeman, in preparing the official edition of the reports, was not an author, within

the meaning of the act of Congress, and that it was not intended by that act that he should assert a monopoly in the result of his official labors.

But, although there can be no copyright in the opinions of the judges, or in the work done by them in their official capacity as judges, *Banks* v. *Manchester, ante,* 244, yet there is no ground of public policy on which a reporter who prepares a volume of law reports, of the character of those in this case, can, in the absence of a prohibitory statute, be debarred from obtaining a copyright for the volume, which will cover the matter which is the result of his intellectual labor.

In the present case there was no legislation of the State of Illinois which forbade the obtaining of such a copyright by Mr. Freeman, or which directed that the proprietary right which would exist in him should pass to the State of Illinois, or that the copyright should be taken out for or in the name of the State, as the assignee of such proprietary right. Even though a reporter may be a sworn public officer, appointed by the authority of the government which creates the court of which he is made the reporter, and even though he may be paid a fixed salary for his labors, yet, in the absence of any inhibition forbidding him to take a copyright for that which is the lawful subject of copyright in him, or reserving a copyright to the government as the assignee of his work, he is not deprived of the privilege of taking out a copyright, which would otherwise exist. There is, in such case, a tacit assent by the government to his exercising such privilege. The universal practical construction has been that such right exists, unless it is affirmatively forbidden or taken away ; and the right has been exercised by numerous reporters, officially appointed, made sworn public officers, and paid a salary under the governments both of States and of the United States.

This question was, it is true, not directly adjudged in *Wheaton* v. *Peters,* 8 Pet. 591. In that case the owners of the copyrights of Wheaton's Reports of the Supreme Court of the United States brought a suit in equity against Mr.

Peters for publishing and selling a volume of his Condensed Reports of the Supreme Court. The bill was dismissed by the Circuit Court. On an appeal by the plaintiffs to this court one of the points urged by the defendants was, that reports of the decisions of this court, published by a reporter appointed under the authority of an act of Congress, were not within the provisions of the law for the protection of copyrights. This court held (1) that the plaintiffs could assert no common law right to the exclusive privilege of publishing, but must sustain such right, if at all, under the legislation of Congress; (2) that under such legislation there must have been, in order to secure the copyright, a compliance with the provisions of the statute in regard to the publication in a newspaper of a copy of the record of the title of the book, and in regard to the delivery of a copy of it, after publication, to the Secretary of State. The court remanded the case to the Circuit Court for a trial by a jury, as to whether there had been a compliance with the above-named requisites of the act of Congress. In a note by Mr. Peters, at page 618 of the report of the case, he states that he has been informed that the court did not consider the point whether reports of the decisions of the court, published by a reporter appointed under the authority of an act of Congress, were within the provisions of the law for the protection of copyrights.

When the suit was brought, Mr. Wheaton had published the twelve volumes of his copyrighted reports. The allegation of the bill was, that the volume complained of, published by Mr. Peters, contained all the reports of cases found in the first volume of Wheaton's Reports. It appears from the report of the case, and the record in it, that Mr. Wheaton had published his first volume in 1816, and his twelfth volume in 1827. From March 3d, 1817, for three years, the reporter had a salary of $1000 a year, and the same salary from May 15th, 1820, to March 3d, 1826, and for three years from February 22d, 1827. The decree of this court, providing for a trial by a jury, (p. 698,) covered the entire twelve volumes of Wheaton's Reports.

If this court had been of opinion that there could not have

been a lawful copyright in the volumes of Wheaton's Reports, it would have been useless to send the case back to the Circuit Court for an inquiry whether the conditions precedent to the obtaining of a lawful copyright, under the act of Congress, had been complied with, especially in view of the fact that the opinion of the court concludes (p. 668) with this statement: "It may be proper to remark that the court are unanimously of opinion that no reporter has or can have any copyright in the written opinions delivered by this court; and that the judges thereof cannot confer on any reporter any such right." Therefore, the only matter in Wheaton's Reports which could have been the subject of the copyrights in regard to which the jury trial was directed, was the matter not embracing the written opinions of the court, namely, the title-page, table of cases, head-notes, statements of facts, arguments of counsel, and index. Such work of the reporter, which may be the lawful subject of copyright, comprehends also the order of arrangement of the cases, the division of the reports into volumes, the numbering and paging of the volumes, the table of the cases cited in the opinions, (where such table is made,) and the subdivision of the index into appropriate, condensed titles, involving the distribution of the subjects of the various head-notes, and cross-references, where such exist. A publication of the mere opinions of the court, in a volume, without more, would be comparatively valueless to any one.

The case of *Wheaton* v. *Peters* was decided at January term, 1834. In *Gray* v. *Russell*, 1 Story, 11, in 1839, Mr. Justice Story, in speaking of the question as to how far a person was at liberty to extract the substance of copyrighted law reports, says, p. 20: "In the case of *Wheaton* v. *Peters*, 8 Peters' R. 591, the same subject was considered very much at large. It was not doubted by the court that Mr. Peters' Condensed Reports would have been an infringement of Mr. Wheaton's copyright, supposing that copyright properly secured under the act, if the opinions of the court had been or could be the proper subject of the private copyright by Mr. Wheaton. But it was held, that the opinions of the court, being published under the authority of Congress, were not the

proper subject of private copyright. But it was as little doubted by the court, that Mr. Wheaton had a copyright in his own marginal notes, and in the arguments of counsel as prepared and arranged in his work. The cause went back to the Circuit Court for the purpose of further inquiries as to the fact, whether the requisites of the act of Congress had been complied with, or not, by Mr. Wheaton. This would have been wholly useless and nugatory, unless Mr. Wheaton's marginal notes and abstracts of arguments could have been the subject of a copyright; (for that was the work which could be the subject of a copyright;) so that if Mr. Peters had violated that right, Mr. Wheaton was entitled to redress." This seems to us to be a proper view of the decision in *Wheaton* v. *Peters;* and that decision is as applicable where a reporter receives a compensation or salary from the government, as where he does not, in the absence of any restriction against his obtaining a copyright.

In the present case, although Mr. Freeman, during the period of his preparation of volumes 32 to 46, received no direct salary from the State, it is contended by the defendants that he received from the State compensation for his services, through the purchase by it, under a statute, of copies of his volume at a stated price of $6 per copy for 553 copies of each volume, and that this was substantially the payment of a salary to him by the State. But, as stated before, in the view we take of the case, the question of a salary or no salary has no bearing upon the subject.

The general proposition that the reporter of a volume of law reports can obtain a copyright for it as an author, and that such copyright will cover the parts of the book of which he is the author, although he has no exclusive right in the judicial opinions published, is supported by authority. Curtis on Copyright, 131, 132; *Butterworth* v. *Robinson*, 5 Ves. 709; *Cary* v. *Longman*, 1 East, 358, and note, 362; *Mawman* v. *Tegg*, 2 Russell, 385, 398, 399; *Hodges* v. *Welsh*, 2 Irish Eq. 266, 287; *Lewis* v. *Fullarton*, 2 Beavan, 6; *Saunders* v. *Smith*, 3 Mylne & Cr. 711; *Sweet* v. *Benning*, 16 C. B. 491; *Jarrold* v. *Houlston*, 3 Kay & Johns. 708, 719, 720.

It is further contended by the defendants, that the plaintiff is not entitled to relief in respect to volumes 32 to 46, because he did not comply with the conditions of the statute concerning copyrights. Those volumes were all of them published while the act of Congress of February 3, 1831, c. 16, 4 Stat. 436, was in force. The 4th section of that act provided that no person should be entitled to the benefit of the act, unless he should, before publication, deposit a printed copy of the title of the book intended to be copyrighted in the clerk's office of the District Court of the district wherein the author or proprietor should reside. The section also required, that the clerk should record such title forthwith, in a book, in words prescribed in the section, giving a copy of the title, under the seal of the court, to the author or proprietor, whenever he should require the same. It also provided, that the author or proprietor should, within three months from the publication of the book, deliver or cause to be delivered a copy of the same to the clerk of the District Court, and that it should be the duty of the clerk, at least once in every year, to transmit a certified list of all such records of copyright, including the titles so recorded, and the dates of record, and also all the copies of books deposited in his office, to the Secretary of State, to be deposited in his office.

Although, under § 6 of the same act, the exclusive right to the copyright vests upon the recording of the title of the book, and runs for the prescribed period from that date, and although the right of action for infringement, under § 6, also accrues at that time, yet it is quite clear, that, under § 4, in respect at least to suits brought after three months from the publication of the book, it must be shown, as a condition precedent to the right to maintain the suit, that a copy of the book was delivered to the clerk of the District Court within three months from the publication.

Section 5 of the same act provides, that no person shall be entitled to the benefit of the act, unless he shall give information of copyright being secured, by causing to be inserted in the published copies, on the title-page of the book or the page immediately following, the words: "Entered according to act

of Congress, in the year ——, by A. B., in the clerk's office of the District Court of ——."

Undoubtedly, the three conditions prescribed by the statute, namely, the deposit before publication of the printed copy of the title of the book, the giving of information of the copyright by the insertion of the notice on the title-page or the next page, and the depositing of a copy of the book within three months after the publication, are conditions precedent to the perfection of the copyright. *Wheaton* v. *Peters*, 8 Pet. 591; *Merrell* v. *Tice*, 104 U. S. 557.

It is contended by the defendants that the plaintiff has not proved the date of the publication of any of the volumes in question; that the only proof he has offered is in the form of certificates by the clerk of the District Court, showing the dates of the filing of the printed titles of the volumes; and that he has failed to show whether such filing preceded or followed the publication of the volumes.

The record shows that the plaintiff, in respect of volumes 32 to 46, offered in evidence fifteen certificates made by William H. Bradley, clerk of the District Court of the United States for the Northern District of Illinois, each of which was in the following form, except as to the number of the volume, and its contents, and except that, as to volumes 39 to 43, the name "Eugene B. Myers," and as to volumes 44 to 46, the name "E. B. Myers," was substituted for the names "E. B. Myers & Chandler:"

"United States of America, $\Big\}$ *ss:*
"*Northern District of Illinois,*

"Clerk's Office of the District Court of the
"United States for said District.

"Be it remembered, that on the 12th day of August, A.D. 1865, E. B. Myers & Chandler, of said district, deposited in this office the title of a book as follows, to wit: Reports of cases at law and in chancery argued and determined in the Supreme Court of Illinois, by Norman L. Freeman, counsellor-at-law, volume 32, containing the remainder of the cases

decided at the April term, and a part of the cases decided at the November term, 1863 —

"The right whereof they claim as proprietors, in conformity with an act of Congress entitled 'An act to amend the several acts respecting copyrights.'

"WM. H. BRADLEY, *Clerk.*

" NORTHERN DISTRICT OF ILLINOIS, *ss :*

"I, William H. Bradley, clerk of the District Court of the United States for the Northern District of Illinois, do hereby certify the foregoing to be a true copy from the records of said court in the matter of the entry of a copyright by E. B. Myers & Chandler, as the same appears of record in said court and now remaining in my custody.

"In testimony whereof I have hereunto set my hand and affixed the seal of said court, at my office, in Chicago, this 12th day of August, A.D. 1865, and of our Independence the 90th year.

"[L. S.]                          "WM. H. BRADLEY, *Clerk.*

" Work deposited Jan'y 17th, 1866.

"WM. H. BRADLEY, *Cl'k.*"

The certificates show that the dates of the several deposits of the titles and of the works were as hereinbefore stated. The certificate to the copy of the title bears date in each case the same day as the deposit of the title. In each case, the memorandum of the deposit of the work was in the same form as that in regard to volume 32, with the necessary change of date, except that in regard to volumes 35, 36, 42, 43, and 44, the memorandum was, "Work deposited in my office," with the date.

When the certificates were offered in evidence, the defendants objected to the introduction of that portion of each of the papers, at the bottom thereof, which purported to show the date when the volume was deposited, on the ground that the same constituted no part of the certificate, but was a mere anonymous statement; that it did not appear when or by whom the same was made; and that the evidence was incom-

petent to show the date of the deposit. The objection was overruled by the court, and the defendants excepted.

They also objected to the introduction of the paper pertaining to volume 34, on the ground that, even if the memorandum at the bottom of the paper was competent evidence of the date when the volume was deposited, the deposit was made at the same time with the deposit of the printed title-page, namely, October 23, 1866; that it did not appear that the title-page was filed in advance of the publication and the work deposited after publication; and that the paper was, therefore, incompetent as evidence. The objection was overruled by the court, and the defendants excepted to such ruling.

The defendants also objected to the introduction of the paper as to volume 35, for the reason that it purported to show that the title of the volume was deposited on the 28th of January, 1867, while the printed notice on the back of the title-page of that volume stated that the copyright was entered "in the year 1866;" and that, because of such variance, the paper was incompetent as evidence. The objection was overruled by the court, and the defendants excepted to the ruling.

These various objections are now urged by the defendants, and it is contended that the memorandum of the date of the deposit of the work, written on the certificate, and purporting to be signed by the clerk, is not in the form of a certificate by the clerk of the fact and the date of the deposit of the book, and is not competent proof of such fact or date, and is not attested by the official seal of the clerk; and that no proof was offered as to the genuineness of the signature purporting to be that of the clerk.

The statute makes no provision for the keeping by the clerk of a record of the deposit of the book with him after publication. The memorandum of the deposit of the book, signed in each case by the clerk, appears to have been written, in each case, on the certified copy, furnished to the proprietor, by the clerk, of the record of the deposit of the title of the book. The two things were thus connected together by the act of the officer whose duty it was to receive both the deposit

of the title and the deposit of the book. The paper amounts to a sufficient certificate by him of the fact and the date of the deposit of the book. In the absence of evidence to the contrary, which it was open to the defendants to introduce, it must be presumed that the deposit of the title was made in each case before publication, and, also, that in every instance where the work purports to have been deposited within three months after the date of the deposit of the title, it was deposited within three months after publication.

So, also, in the case of volume 34, it must be equally presumed, in the absence of evidence to the contrary, that the deposit of the title was made before publication, and that the deposit of the work, though made on the same day with the deposit of the title, was not made prior to publication.

In the case of volume 32, however, although it is to be presumed that the title was deposited before publication, yet, as the work was deposited five months and five days after the deposit of the title, it cannot be presumed that such deposit of the work was made within three months after publication. The evidence therefore fails as to volume 32; but it is sufficient, *prima facie*, as to all the other volumes.

Section 4 of the act of 1831 requires the clerk to give a copy of the title as deposited and recorded, under the seal of the court, to the author or proprietor who deposits it whenever he shall require the same. Necessarily, such copy is sufficient *prima facie* evidence of the deposit of the title. Such a copy was given in regard to each of the volumes in question here. On each of these papers the memorandum of the fact and of the date of the deposit of the work, signed by the clerk, was written. The clerk was the officer required to receive the deposit of the work. He was not required to keep a record of such deposit; and he was required to transmit the works so deposited, to the Secretary of State, at least once a year. The memorandum in the present case of the fact and date of the deposit, purporting to be signed by the clerk, must be regarded as a sufficient *prima facie* certificate of such deposit, and as competent evidence of the fact and of the date, without further proof of the signature of the clerk, that

being on the same paper with his signature as clerk to the certificate of the copy of the record of the deposit of the title, and it being open to the defendants to show that his signature to the memorandum was not genuine.

We do not think the present case is governed by the decision in *Merrell* v. *Tice*, 104 U. S. 557. In that case the librarian of Congress had given a certificate to a copy of the record of the deposit of the title of the book. On that paper was written a memorandum in these words: "Two copies of the above publication deposited" on a date given. This memorandum was not signed by the librarian of Congress. This court held the memorandum not to be competent as proof of the deposit of the two copies of the book, on the ground that it was not a certificate of that fact. We are of opinion that the memorandum in the present case, purporting to be signed by the same clerk, is substantially a certificate of the fact and date of the deposit of the work, written by him on the same paper with the other certificate; and that it is not open to the objection which obtained in the case of *Merrell* v. *Tice*.

The defendants offered in evidence certificates made by the auditor of public accounts and by the Secretary of State of the State of Illinois, showing that, on the 2d of October, 1865, Mr. Freeman delivered to the Secretary of State, for the use of the State, 553 copies of volume 32, required by law to be furnished by the reporter, and, on the 23d of October, 1866, 553 copies of volume 34. The introduction of this evidence was objected to by the plaintiff, on the ground that the papers constituted no evidence of the publication of either of the volumes, and were incompetent. The objection was sustained by the court, and the defendants excepted to the ruling. The exclusion of these papers is assigned as error. The papers also show the payment by the State, for each set of the copies, at the rate of $6 per volume. As the delivery of the copies of volume 32 to the Secretary of State, for the use of the State, took place on the 2d of October, 1865, and the work was not deposited in the clerk's office until the 17th of January, 1866, it is contended that such delivery of the copies to the State

was a publication of the volume, and that the deposit of it did not take place until three months and fifteen days after publication. We think this assignment of error must prevail; that the evidence offered was competent; that the delivery of the copies for the use of the State was a publication of the volume; that the deposit of the work was not made in time; and that the copyright of volume 32 therefore fails. But we do not think the same objection is tenable as to volume 34, although the 553 copies of that volume were delivered on October 23, 1866, and the title and the work were both of them deposited on that day. It must be presumed, in the absence of evidence to the contrary, that the deposit of the title preceded the publication, and that the delivery of the copies to the Secretary of State preceded the deposit of the work in the clerk's office. Where the three things are prescribed by the statute to be done in consecutive order, and all three appear to have been done on the same day, it will be presumed that the statute was complied with, leaving the *prima facie* evidence open to be rebutted.

In regard to volume 35, the title was deposited January 28, 1867, and the notice printed in the volume purports to show that the copyright was entered in 1866. The statute required that each copy of the book should have inserted in it a statement of the year the copyright was entered. It is sufficient to say, in answer to this objection, that the variance must be regarded as immaterial, inasmuch as the statement that the title was recorded in an earlier year than the actual year, being conclusive on the person taking the copyright, could cause no injury to any other person or to the public, because the copyright would expire in twenty-eight years from the expiration of the year stated in the notice in the book, and not in twenty-eight years from the time of the recording of the title.

In regard to volume 36, it is objected that the certificate of the clerk shows that the printed title was deposited by "E. B. Myers & Chandler," and that the printed notice of the entry of copyright in the volume as published purports to show that the copyright was entered by E. B. Myers alone.

We think that, under the circumstances of the case, as the printed notice contained the name of E. B. Myers, the variance was immaterial, and that the statute was substantially complied with, particularly as it is not shown that the defendants were misled by the variance or induced to do or omit anything because of it.

It is also urged by the defendants that the court erred in finding the title to the volumes to be in the plaintiff, because he failed to prove any written assignment or transfer to him from Mr. Freeman as to any of the volumes, or from Chandler as to his alleged interest in volumes 32 to 38, or to prove any means through which he derived title to any of the volumes. By section 4 of the act of 1831 the proprietor of a book, as well as its author, could obtain a copyright, and provision was made, in the form of record given in that section, for a claim by the depositor of the title of the book as its proprietor, and for the deposit of the copy of the book by the proprietor. While, after the obtaining of a copyright, a written assignment may be necessary to convey title to it, or a written license to give a right to reproduce copies of the copyrighted book, we perceive no reason why Myers or Myers & Chandler could not become the owners by parol transfer of whatever right Mr. Freeman, prior to the taking of the copyright, had to convey. While the work was in manuscript no written transfer of such manuscript from Mr. Freeman was necessary, because the copyright had not yet been taken. Moreover, the defendants, in all their transactions with the plaintiff, recognized his title to the copyrights of volumes 32 to 38, as to which the titles had been deposited by E. B. Myers & Chandler, and parol evidence that the plaintiff owned the copyrights of volumes 32 to 46, at the time the infringements were committed, was introduced without objection, and was sufficient *prima facie* evidence until rebutted. If the defendants had objected to this parol evidence the production of the written assignment from Chandler, set up in the bill, could have been required.

It is also objected that the plaintiff acquiesced in, consented to, and ratified the publication of the volumes by the defend-

ants, and was guilty of laches in bringing his suit. The evidence on this subject is voluminous, and it would not be profitable, either for the purposes of this case or as a guide for any other case, to discuss it at length. We are of opinion that neither of these defences is established; that the plaintiff did not consent to the republication of the volumes by the defendants; that he never abandoned his copyrights, or consented to surrender them without consideration, or gave the defendants cause to understand that he did so or would do so; that he never acquiesced in any infringement of his copyrights by the defendants; and that he was not guilty of laches in seeking relief. The defendants recognized his copyrights in volumes 32 to 38, by offering to purchase them, and there was considerable negotiation on that subject. This fact is inconsistent with consent and abandonment, and the other evidence in the case is inconsistent with any abandonment.

It is also contended by the defendants, that each of the volumes as published by them was a new and independent work, not copied from that of the plaintiff, but prepared by the original labor of the editors employed by the defendants. While it is admitted that volumes 32 to 38, as published by the defendants, were, with the exception of the foot-notes, prepared entirely from the plaintiff's volumes, it is contended that volumes 39 and 41 to 46 were, with the exceptions of the opinions of the judges, prepared from the records and files of the Supreme Court of Illinois. The evidence on the subject of infringement is very full and minute. It is impossible for us to discuss it at length, and we must content ourselves with stating, as a general result, that we concur in the views stated by Judge Drummond, in his decision in the Circuit Court, in regard to volumes 32 to 38. He says, (10 Bissell, 139, 147:) "In considering the question of infringement of the copyright by the defendants, it must be borne in mind what is the character of the work. They are reports of the decisions of the Supreme Court of this State, to which no one can have a copyright; but he may have to the head-notes and statements of each case, and of the arguments of counsel. These head-notes and statements which have been made are in themselves

an abridgment; the one of the opinions of the court, consisting of the principles of law decided, and the other an abstract of the facts and of the arguments.   It should also be stated that the volumes of the defendants, as edited by those employed by them, are very much condensed, as compared with Mr. Freeman's reports, and yet the paging of the volumes is substantially the same throughout, so that the cases in the corresponding volumes appear on the same page.   The list of cases which precedes each report is the same.   The defendants Ewell and Denslow, who were employed by the other defendants to annotate these decisions or reports, both state, upon examination, that their work was independent of that of Mr. Freeman; but it appears from the evidence that all the volumes of Mr. Freeman were used in thus editing or annotating; and although it may have been their intention to make an independent work, it is apparent, from a comparison of the Freeman volumes and those of the defendants, that the former were used throughout by the editors employed by the defendants.   It is true that in each volume, perhaps in the majority of cases, there is the appearance of independent labor performed by them, without regard to the volumes of Mr. Freeman; but yet in every volume it is also apparent that Mr. Freeman's volumes were used; in some instances words and sentences copied without change, in others, changed only in form; and the conclusion is irresistible, that for a large portion of the work performed in behalf of the defendants, the editors did not resort to original sources of information, but obtained that information from the volumes of Mr. Freeman.   Undoubtedly, it was competent for an editor to take the opinions of the Supreme Court, and possibly from the volumes of Mr. Freeman, and make an independent work; but it is always attended with great risk for a person to sit down, and, with the copyrighted volume of law reports before him, undertake to make an independent report of a case.   It is not difficult to do this, going to the original sources of information, to the decisions of the court, the briefs of counsel, the records on file in the clerk's office, without regard to the regular volumes of reports.   Any one who has tried it can easily

understand the difference between the head-notes of two persons, equally good lawyers, and equally critical in the examination of an opinion, where they are made up independent of each other; and, bearing in mind this fact, it seems to be beyond controversy, that although in many, and perhaps most instances, there is a very considerable difference between the head-notes of the defendants' volumes and those of the plaintiff, the latter have been freely used in the preparation of the former. I conclude, therefore, that the defendants have, in the preparation of those volumes, from 32 to 38 inclusive, of the Illinois Reports, used the volumes of the plaintiff so as to interfere with his copyright."

So, also, we concur with the conclusions of Judge Drummond in regard to volumes 39 to 46. He says, (20 Fed. Rep. 441 :) " The present inquiry is limited to what is alleged to be an infringement by the defendants of volumes 39 to 46, inclusive, of Mr. Freeman's Illinois Reports. Volume 40 seems never to have been regularly published like the other volumes, although the evidence of the infringement of the plaintiff's copyright in that volume is perhaps stronger than that applicable to any of the other volumes named. Upon comparing parts of each of the volumes, those of the complainant and of the defendants, one with the other, I think there can be no doubt that in some respects, in each case, the Freeman volume has been used by the defendants in the head-notes, the statements of facts, and the arguments of counsel. That is, there are certain unmistakable *indicia*, that in every volume prepared by the defendants they have not confined themselves solely to the original sources of information, namely, the opinions of the judges, the records, and the arguments of counsel." He also says, (p. 442 :) " The fact appears to be, and indeed it is not a subject of controversy, that in arranging the order of cases, and in the paging of the different volumes, the Freeman edition has been followed by the defendants ; but, while this is so, I should not feel inclined, merely on that account and independent of other matters to give a decree to the plaintiff, although it is claimed that the arrangement of the cases and the paging of the volumes are protected by a copyright.

Undoubtedly, in some cases, where are involved labor, talent, judgment, the classification and disposition of subjects in a book entitle it to a copyright. But the arrangement of law cases and the paging of the book may depend simply on the will of the printer, of the reporter, or publisher, or the order in which the cases have been decided, or upon other accidental circumstances. Here the object on the part of the defendants seems to have been that there should not be confusion in the references and examination of cases; but the arrangement of cases and the paging of the volumes is a labor inconsiderable in itself, and I regard it, not as an independent matter, but in connection with other similiarities existing between the two editions, when I say, taking the whole together, the Freeman volumes have been used in editing and publishing the defendants' volumes." It may be added, that one of the most significant evidences of infringement exists frequently in the defendants' volumes, namely, the copying of errors made by Mr. Freeman.

The next objection urged is, that the defendants were compelled to produce their books and papers on the accounting before the master, the plaintiff having sought a forfeiture of the copies of volumes 32 to 38; and that the defendants were thereby compelled to produce evidence against themselves, in aid of such forfeiture.

The original bill prays for a decree that all of the copies published by the defendants of volumes 32 to 38 be forfeited to the plaintiff, and that the defendants be required to deliver the same to him. The supplemental bill contains no such prayer in regard to volumes 39 and 41 to 46, but contains a prayer for general relief. The cross-bill and the answer to it show that Myers brought an action of replevin against Callaghan & Co., to recover as forfeited the copies of the infringing volumes 32 to 38. The final decree shows that the cross-suit was not brought to a hearing with the original suit. On the contrary, the final decree reserves for consideration and determination, on the hearing of the cross-bill, the rights of the parties thereunder, and their rights in respect to the action of replevin to recover possession of the unsold copies of vol-

umes 32 to 38. Although, under the provisions of the interlocutory decree in respect to volumes 32 to 38, the defendants were required to produce their account-books and papers before the master, and were examined in regard to them, yet the final decree did not award any forfeiture, and so no injury has resulted to the defendants by reason of such provision of the interlocutory decree, or by reason of any action thereunder. Irrespective of this, it is determined by the case of *Stevens* v. *Gladding*, 17 How. 447, that the penalties given by § 7 of the copyright act of 1831 cannot be enforced in a suit in equity. The provision of the interlocutory decree for an examination of the defendants in regard to the subject of inquiry, and for the production by them of their account-books and papers, is the usual provision in an interlocutory decree in a suit in equity for the infringement of a copyright. As the forfeiture of the volumes could not be obtained by this suit, although prayed for in the bill, the evidence was admissible.

We now come to the question of damages. It is contended that the Circuit Court erred in disallowing to the defendants a credit for stereotyping volumes 32 to 46. Both of the masters refused to allow credit for the cost of stereotyping. Stereotyping was not a necessary incident of printing and publishing, as type-setting was. It was resorted to by the defendants to enable them the more successfully and profitably to infringe, by dispensing with the necessity of resetting the type for every new edition, and thus reducing the cost of multiplying copies in the future. The stereotype plates were made without the consent of the plaintiff, and if credit is allowed for them the plaintiff is compelled to buy and pay for them, when they are useless to him, and when he has stereotyped for himself volumes 32 to 46.

It is also contended, that both of the masters erred in disallowing a credit to the defendants for the amount paid to the different members of their firm for their services, in the way of salaries, as a part of the expense of conducting their business, being the amount of about $12,000 a year during the period in controversy. These amounts were drawn by the

defendants under the partnership agreement, as family and personal expenses. We do not think that the value of the time of an infringer, or the expense of the living of himself or his family, while he is engaged in violating the rights of the plaintiff, is to be allowed to him as a credit, and thus the plaintiff be compelled to pay the defendant for his time and expenses while engaged in infringing the copyright. If the defendants, instead of employing others to do the work, had chosen to do it themselves, they might as well have made a charge, and claimed to have been credited for it, of so much a month or a year for their services in preparing the infringing volumes. *Elizabeth* v. *Pavement Co.*, 97 U. S. 126, 139. The case stands on a different footing from that of the salaries of the managing officers of a corporation, as in *Rubber Company* v. *Goodyear*, 9 Wall. 788.

The defendants also object that the master, Mr. Bennett, should have found the number of volumes sold by the defendants to have been 103 less, and that the total number of bound volumes on hand found by him was erroneous, as also was the total number of volumes found by him to have been on hand unsold. The exceptions to the master's report in these respects substantially complain that the master found too many volumes to have been sold, by 103. We do not perceive any error in the above particulars. The master, Mr. Bennett, rightfully excluded a credit for the cost of producing copies of the volumes which the defendants did not sell. There were no profits from copies not sold, and, therefore, there could have been nothing to charge against such profits.

In regard to the exceptions to the report of Mr. Bennett, that he found the average selling price of the defendants' volumes to be $4.464 each, instead of $4.34, and that he found their gross receipts from sales of the infringing volumes to have been $10,231.48, instead of $9459.37, we are of opinion that the selling price found and the gross receipts found were not too high.

We do not concur in the view of the defendants that there were no net receipts or profits on the sales of volumes 39 to 46, or in the view that the master, Mr. Bennett, erred in refusing

credit to the defendants for the amount paid by them for editorial work in preparing their volumes, or in the view that the Circuit Court erred in allowing the $340.70 as profits on the resales of the 156 volumes mentioned in the first and second exceptions of the plaintiff to the report of the master, Mr. Bennett.

In regard to the 156 copies, they were volumes which had been already sold by the defendants, and which they purchased as second-hand books and resold. The master, had held that, as he had charged the defendants with the profits on the first sale of these volumes, the profits on their resale could not be charged against them. The Circuit Court overruled this view and, as we think, properly. The sale of the volume originally prevented the purchase from the plaintiff of a lawful volume, and the sale of the same infringing volume a second time prevented the purchase from the plaintiff of another lawful volume. The plaintiff was thus twice injured by the acts of the defendants, and the sales of the second-hand volumes must be accounted for as if they were first sales. *Birdsell* v. *Shaliol*, 112 U. S. 485, 487, 488.

The Circuit Court held that the master approximated as nearly as could be done to the true amount, in fixing the selling price at $4.464 per volume. We concur in this view.

In regard to the eighth exception of the defendants to the report of the master, Mr. Bennett, that he had credited the defendants, in their expense account, with only 12 per cent on their gross sales, instead of 17 per cent, the Circuit Court held that, as Mr. Bennett had allowed 12 per cent and Mr. Bishop had allowed 12¾ per cent for such average expenses, and those conclusions were so nearly alike, the court would allow their findings in this regard to stand. We concur in this view, and also in the conclusion of the Circuit Court sustaining the findings of the two masters as to the average price per volume at which the defendants sold the volumes.

In regard to the general question of the profits to be accounted for by the defendants, as to the volumes in question, the only proper rule to be adopted is to deduct from the selling price the actual and legitimate manufacturing cost. If the

volume contains matter to which a copyright could not properly extend, incorporated with matter proper to be covered by a copyright, the two necessarily going together when the volume is sold, as a unit, and it being impossible to separate the profits on the one from the profits on the other, and the lawful matter being useless without the unlawful, it is the defendants who are responsible for having blended the lawful with the unlawful, and they must abide the consequences, on the same principle that he who has wrongfully produced a confusion of goods must alone suffer. As was said by Lord Eldon, in *Mawman* v. *Tegg*, 2 Russell, 385, 391: "If the parts which have been copied cannot be separated from those which are original, without destroying the use and value of the original matter, he who has made an improper use of that which did not belong to him must suffer the consequences of so doing. If a man mixes what belongs to him with what belongs to me, and the mixture be forbidden by the law, he must again separate them, and he must bear all the mischief and loss which the separation may occasion. If an individual chooses in any work to mix my literary matter with his own, he must be restrained from publishing the literary matter which belongs to me; and if the parts of the work cannot be separated, and if by that means the injunction, which restrained the publication of my literary matter, prevents also the publication of his own literary matter, he has only himself to blame." The present is one of those cases in which the value of the book depends on its completeness and integrity. It is sold as a book, not as the fragments of a book. In such a case, as the profits result from the sale of the book as a whole, the owner of the copyright will be entitled to recover the entire profits on the sale of the book, if he elects that remedy. *Elizabeth* v. *Pavement Co.*, 97 U. S. 126, 139.

In considering the exceptions of the defendants to the masters' reports in matters of fact, questioning the accuracy of their conclusions in respect to the amount of the defendants' profits, we have observed the rule recognized and affirmed in *Tilghman* v. *Proctor*, 125 U. S. 136, 149, that, in dealing with such exceptions, "the conclusions of the master, depending

upon the weighing of conflicting testimony, have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake·on his part."

On the whole case we are of opinion that the final decree was· correct, except in respect of volume 32. The amount of damages reported by the master, Mr. Bishop, as to that volume, and allowed by the final decree as part of the $6986.05, was $926.66. That sum is disallowed and must be deducted. The other items of recovery in the decree were proper. The injunction as to volume 32 must be vacated, and the appellee will recover his costs of this. court.

*The decree of the Circuit Court is reversed as to volume 32 and is affirmed in all other respects; and the case is remanded to that court, with a direction to correct the decree in the particulars ,above indicated, and to· take such further proceedings as may be according to law and not inconsistent with this opinion.*