HENRY *et al. v.* TRAVELERS' INS. Co.

*(Circuit Court, D. Colorado.* May 15, 1890.)

**1. ACCOUNTING—EVIDENCE—CORPORATE DEBTS.**

Plaintiff and defendant made a contract by which defendant was to take bonds of certain ditch companies, in which they were interested, in payment of all debts due defendant from the companies, and for advances thereafter to be made to them. Plaintiff was to surrender the obligations of the companies and those given by plaintiff for the benefit of the companies. This agreement did not apply to the private debts of plaintiff to defendant. On an accounting directed in a suit to enforce the contract, the master included in the debts of the companies certain notes, on their face the personal obligations of plaintiff to defendant. All the other obligations were notes executed by the companies, and indorsed by plaintiff. At the time plaintiff applied for the loan of defendant, for which all these notes were given, he stated that he wanted for personal uses an amount equal to that for which the individual notes were given. Moreover, some of it was paid by defendant for the purpose of obtaining the release of stock owned by plaintiff individually. Furthermore, in a statement of plaintiff's personal resources made after the loan, and under plaintiff's direction, for defendant, these individual notes were included in his personal liabilities. *Held*, that they were improperly included in the statement of the companies' debts.

**2. SAME—CONSTRUCTION OF CONTRACT.**

Defendant is entitled to receive bonds of the companies for advances made, since the commencement of this suit, for the completion of the companies' canals.

**3. SAME—COLLATERAL NOTES.**

Plaintiff gave defendant certain chattel notes as collateral security for "past, present, or future indebtedness." *Held* that, in the absence of negligence, defendant should be charged only with such amount as it had collected.

**4. SAME—INTEREST.**

As judgments in Colorado draw interest, defendant should have been allowed interest on such judgment to the time of its payment.

**5. SAME.**

Defendant should be allowed interest on its claims against plaintiff to the date of the master's report, and, on its claims against the companies, to the time it received, or should have received, bonds in payment.

**6. SAME—ACCOUNT-BOOK—EVIDENCE.**

In the absence of proof that an entry in defendant's books, showing that a certain claim against plaintiff was paid, was made without the direction of some officer or agent of defendant having authority to direct it, it will be presumed to have been made by its authority, and to be correct.

In Equity. On exceptions to master's report.

For former reports, see 33 Fed. Rep. 132; 34 Fed. Rep. 258; 35 Fed. Rep. 15.

*J. P. Brockway*, for complainants.
*Wolcott & Vaile* and *D. V. Burns*, for respondent.

CALDWELL, J. This case is before the court on the defendant's exceptions to the master's report. For six days the court has listened to the reading of the testimony bearing on the exceptions, and to an intelligent discussion of it by counsel. The perfect familiarity of counsel with the large volume of evidence in the case is highly creditable to them, and has proved extremely gratifying and helpful to the court.

In considering the exceptions to the master's report in matters of fact, I shall observe and keep in view the rule recognized and affirmed by the supreme court of the United States in *Tilghman* v. *Proctor*, 125 U. S. 136, 149, 8 Sup. Ct. Rep. 894, and *Callaghan* v. *Myers*, 128 U. S. 617, 666, 9 Sup. Ct. Rep. 177, namely, that "the conclusions of the master, depending upon the weighing of conflicting testimony, have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part."

The decree establishing the contract between Mr. Henry and the insurance company states the terms of that contract in these words:

"That the contract was entered into on or about the month of November, A. D. 1884, by and between the said complainant T. C. Henry and the defendant, the Travelers' Insurance Company, as is alleged in said complaint herein, by which the defendant agreed to take the bonds of the several ditch companies as aforesaid, to be by them issued, for its holding of old bonds theretofore issued by said companies, and for all advances which the defendant had made or should make on account of, or for the benefit of, the several ditch companies, no matter how they were evidenced, or by what security, in payment thereof, and in payment of all the notes and obligations held by it, given by the said ditch companies, or by the said T. C. Henry, or the Colorado Loan & Trust Company, for the benefit of the said companies mentioned in said complainant's bill, and that all of the said bonds issued by the said several ditch companies, to-wit, the Grand River Ditch Company in the amount of $200,000, the Uncompahgre Canal Company in the amount of $200,000, the Citizens' Ditch & Land Company in the amount of $200,000, and the Del Norte Land & Canal Company in the sum of $400,000, were issued by the said several ditch companies, and that all of the notes and obligations of the said several ditch companies, and of the said T. C. Henry, and of the said Colorado Loan & Trust Company, given by them or either of them to the said defendant for moneys advanced or paid to or for the said several ditch companies, have been paid and satisfied by the delivery of said bonds of said several ditch companies as aforesaid, which bonds the said defendant agreed to take at par in payment of said obligations."

In the opinion of the court rendered at the time this contract was established, it is said:

"Of course, it is not claimed that this contract reaches to any matter outside the obligations of the ditch companies, or that the private debts of Mr. Henry were in any way discharged or to be affected by it." 33 Fed. Rep. 143.

In the opinion of the court rendered on the application to modify the decree, it is said:

"The defendant wishes the decree modified in two respects,—one by the insertion of a clause excluding the private debts of the complainants Henry and the Colorado Loan & Trust Company. * * * So far as the first matter is concerned, it is clearly unnecessary. The decree does not include the private debts referred to; and when the decree was being prepared the language of the draft, as presented to me, was changed purposely, and with the knowledge of counsel, so as not to include such debts. The opinion which I filed indicated that they were not included, and their omission from the decree is fully as potent as a special clause excluding them. The provision in the decree for a statement by the master of the account between complainants and defendant was made under the belief that, when the whole account was stated, if any single item was challenged by either party as improperly placed, either among Mr. Henry's private debts, or among those of the ditch companies, the matter could be separately inquired into by the court, and the error, if any there was, corrected, without a further reference to the master." 34 Fed. Rep. 258.

The master's report has been filed, and among the exceptions to it are several alleging that he erred in placing certain items of Mr. Henry's private indebtedness (or of the Colorado Loan & Trust Company, which stands, as Judge BREWER has already decided, "for all the purposes of this case," for T. C. Henry) among the debts and obligations of the canal companies, to be discharged, under the contract in the bonds of these companies, at par. The principal sum of the debts which it alleged were thus erroneously classified is $81,500, and comprises the following items: (1) Note dated May 22, 1884, for face value of $65,000, but on which $50,000 only was advanced, and is, as both parties agree, to be treated as an obligation for the latter sum; (2) note of May 19, 1884, for $5,000; (3) note of June 23, 1884, for $25,000; (4) note of October 7, 1884, for $1,500. All these notes, on their face, appear to be either personal obligations of Mr. Henry, or the Colorado Loan & Trust Company, which stands for Mr. Henry. In the opinion in the main case, (33 Fed. Rep. 132,) Judge BREWER says:

"Mr. Henry applied to defendant for a loan of $250,000, some of which, he represented, was needed by him for his personal interests, but the major portion for the completion of these several canals. In order to secure this loan, he made an exhibit of his financial condition,—of the securities which he had to offer,—as well as the purposes for which the money was desired."

By reference to the exhibits here referred to in Judge BREWER's opinion,—and it is the statement of Mr. Henry himself,—we find exactly what portion of this $250,000 loan was wanted by Mr. Henry for his private or personal uses, and what portion for the irrigating canal companies. In the application, Mr. Henry, after giving a statement of the affairs of the Citizens' Canal Company, says: "This property * * * needs for present wants $40,000." After giving a like statement for the Grand River Canal, he says: "This enterprise * * * needs $20,000 to supply its financial wants." A like exhibit of the affairs of the Uncompahgre Canal is followed by the statement that "this enterprise needs for its financial wants $50,000." The exhibit of the condition and prospects of the Del Norte Land & Canal Company is followed by the statement that it "requires $60,000." Having specified the exact amount wanted for the several canals, he then says:

"I want a loan of $250,000 for the following purposes:

| " ‹ Citizens' Canal Company, | | | | | | $40,000 |
|---|---|---|---|---|---|---|
| Grand River Canal Company, | | | | | | 20,000 |
| Uncompahgre Canal Company, | | | | | | 50,000 |
| Del Norte Canal Company, | | | | | | 60,000 |
| For general purposes in Colorado, | | | | | | 55,000 |
| For general purposes in Kansas, | | | | | | 25,000 · |
| Total, | | | | | | $250,000 ' " |

It will be observed that the amount wanted for general purposes in Colorado and general purposes in Kansas is $80,000, the exact amount of the notes in controversy, less the note for $1,500, which was given for money to release stocks pledged by Henry for his private debt, in order that the stock might be put up as a part of the pledge for the $250,000 loan. This note was executed some months after the statement above mentioned was made, and of course was not embraced in it. Mr. Henry made another statement in writing of his own and the canal companies' debts, November 3, 1884, when negotiations were pending for the refunding arrangement. Touching this arrangement, Mr. Henry says:

‘ "The statement before me is a copy of one prepared in Hartford under the direction of Mr. Batterson and Mr. Dennis, and based upon information which they had personally, and which was furnished them, from one source and another, at the time, which constituted the basis, in part, of the plan of funding the indebtedness of the several canal enterprises, providing for their wants before referred to, and also bearing upon my own personal resources."

The statement here referred to is in the form of a letter, beginning as follows:

"*Mr. Batterson:* By an examination of my liabilities and assets as you have above set forth, after eliminating the Pawnee Canal matter from both, it will appear that I have $502,550 of private assets to pay $275,000 of personal liabilities."

In this statement he included among his personal liabilities, described, a schedule of notes which includes the notes we are considering. Questioned about one of these statements, Mr. Henry says:

"*Question.* By whom was that statement, introduced by you in connection with your testimony in the main case, prepared? *Answer.* I do not recollect. *Q.* Didn't you testify with reference to that statement with great particularity, in your direct examination in the main case? *A.* I think I did. *Q.* And you do not now know by whom that statement was prepared? *A.* It was undoubtedly prepared at my instance. If you want to know who furnished it, and put it in testimony there, I did. What I was trying to avoid was having personally prepared the statement. I assume the responsibility of whatever appears in that evidence, as far as that is concerned."

The statement here referred to is headed "Statement of Indebtedness (personal) of T. C. Henry, of Denver, Colorado, to the Travelers' Insurance Company, October 11, 1884," and includes the indebtedness under consideration. In addition to these written statements, Mr. Henry testifies as follows:

"*Question.* Didn't I understand that the payments he [that is, Mr. Dennis, the defendant's agent, who came to Colorado to look after the disbursement of the $250,000 loan] made on account of these ditch enterprises when he came out here were advances on account of this $250,000 loan, so far as it was unpaid? *Answer.* No, sir; not to the ditch companies, because we had not received all that we were entitled to under the private accounts. *Q.* What do you mean by 'we?' *A.* I mean the Colorado Loan & Trust Company and myself. We borrowed $70,000 or $80,000 on our own account. *Q.* These securities you were proposing to pledge were not necessarily belonging to the particular company or enterprise to which you wished to devote this money, were they? *A.* Yes, sir; that was my understanding at the time. The idea was to make each company stand by itself. *Q.* But neither the North Poudre nor the State Land & Canal Company were at that time proposing to obtain funds. In other words, these were securities which you held of your own, that you were proposing to pledge on this $250,000 loan? *A.* Or in behalf of my own individual part of it. I did not want to get that mixed up, but wanted each ditch to rely upon its own footing. *Q.* Before you pass on, let me ask you why you say that there was a $65,000 note given for a $50,000 loan for payment? *A.* It is a little difficult to explain that. It was agreed, in making up the items of the $250,000 loan, what security was to be pledged as collateral, and, when it came to the $50,000 for the personal use of myself, the Kansas property was to be used; and the first idea was that the property should be absolutely conveyed as collateral to my note, and afterwards it was decided to use the note in their assets as secured by the collateral, and for that reason the $65,000 mortgage on the real estate was given as collateral, and appears as collateral for the $50,000 advanced by the Travelers' Insurance Company. * * * *Q.* The $25,000, June 23d, note was a note given by you to the Travelers' Insurance Company upon the payment by the Travelers' Insurance Company of an indebtedness of $25,000 to the City National Bank in this city; and such payment was made by the Travelers' Insurance Company for the purpose of releasing the Circle Railroad stock, was it not? *A.* At the time I applied for the $250,000 loan, I expected that $75,000 or $80,000 would come to me personally, and it was agreed I should put up the Abilene farm as security for the part of that money which was to come to me, and also the stock of the Circle Railroad, which was my personal property, for $25,000 besides, both of which sums, and both of which securities, were part of the sums and part of the securities agreed upon at the time the $250,000 loan was made; and, in accordance with that understanding,—that agreement,—this $25,000 note was made some time in June, and the stock placed to it as collateral, and the money obtained upon it by draft in favor of the City National Bank; and I presume it discharged so much of my indebtedness at that time to the bank, which they had been carrying for some time."

Pending the examination of the witness on this subject, Mr. Brockway, plaintiff's attorney, stated to the master:

"We will admit, for the purpose of this examination, that the $25,000 went into the City National Bank, and paid trust company obligations."

The trust company and Mr. Henry are, for the purpose of this accounting, considered as one person. Mr. Henry testified that he took to Colorado capital to the amount of $150,000. He further testified that he invested $125,000 of that sum in the Denver Circle Railroad, and that he invested $40,000 or $50,000 in the exposition building. It will be observed that these two investments more than absorbed all the capital that he took with him to Colorado. In addition to the two enterprises

last mentioned, Mr. Henry was engaged in numerous and diversified pursuits and enterprises calling for the expenditure of large sums of money, as is shown by the following questions and answers:

"*Question.* You used your credit for the purpose of raising funds to build water-works at Silverton; to carry on a coal-mining enterprise in New Mexico, a gold or silver mining enterprise there; to build water-works at Albuquerque; to build the Pawnee Canal; to pay for stock and bonds of the Bushnell High-Line Canal, and for twenty other enterprises,—did you not? *Answer.* More than that, I guess. *Q.* Then why do you say, in answer to my question, that this money was borrowed from the City National Bank by the trust company in connection with these four canal enterprises? *A.* I have not pretended to say it was. I said, in connection with our own business affairs as well as the ditch companies."

If the question at issue rested on Mr. Henry's own written statements and testimony, it would have to be decided against him; but, in addition to Mr. Henry's evidence, Mr. Dennis, the secretary of the defendant company, and other witnesses, testified on behalf of the defendant that these notes were the personal and private obligations of Mr. Henry, and were not included in the refunding contract. At the time of their execution, there was a memorandum, written in red ink across the notes, stating that they were the personal obligations of Mr. Henry. It is not shown that Mr. Henry had knowledge of this memorandum, but it is nevertheless an important item of evidence, as it shows the present attitude of the defendant in reference to these notes as not an after-thought on its part. The ditch company obligations were in the form of notes signed by the ditch companies, and made papable to the order of T. C. Henry, and by him indorsed. There was but one exception to this rule, and in that instance the ditch company and Mr. Henry were joint makers. The notes in controversy, on their face, are the personal obligations of Mr. Henry, or the Colorado Loan & Trust Company, which stands for him. It is obvious from Mr. Henry's own statements and testimony that, at the time he obtained the $250,000 loan, and at the time the refunding contract was made, he owed many private debts in no manner connected with the four ditches, and that the demands upon him for payment of these debts were quite as pressing as they were for the debts growing out of the four ditches. Many of his enterprises were more or less speculative in their character, and undeveloped or unfinished, and likely to call for an outlay of money largely in excess of any receipts from them. It is clear from the evidence that at least $81,500 of the $250,000 loan was used to pay private debts which had no connection with the four ditches. But, if the $50,000 note included in the $81,500, which we have been considering, had in its inception been given for ditch indebtedness payable in bonds of the ditch companies at par, it was afterwards, by the written contract of March 30, 1887, converted into a money demand, and was, in pursuance of that contract, actually paid in money. That contract was entered into between Mr. Henry and the defendant more than 2 years after the making of the refunding contract, and 18 months after this suit was instituted. It contains several mutual covenants between the parties, by which Mr. Henry agreed, in

consideration of certain things to be done by the defendant, and which were done, to pay $50,000, which was to be credited on the $65,000 note; and it was stipulated "that the balance of said $65,000 note is to remain open to litigation, at the option of the said party, to determine the amount due thereon." It is admitted that each party performed his convenants contained in this contract, and that the $50,000 was paid and credited. It is not pretended that in the execution or the subsequent performance of this contract there was any fraud, accident, or mistake, or want of consideration. It is freely conceded that at the time the contract was made, and at the time the money was paid, the plaintiff had full knowledge of all the facts now known to him. For some unexplained, and to the court inexplicable, reason, the master set aside this contract, and required the defendant to pay back to the plaintiff the $50,000 received under it, and to accept payment of that sum in bonds of the ditch companies. The defendant insists that another and sufficient answer to the plaintiff's contention that these notes represent sums paid by him on account of the ditches is found in the fact that he was, as he alleges in his bill, himself the contractor for the construction of these ditches, and was to take the stock and bonds of the ditch companies in payment. The defendant claims that, after he is charged with the stock and bonds he received or should have received under such contracts, there is no such sum due him from the companies as he claims. The court is satisfied to rest its decision of this exception on the other grounds mentioned, and therefore expresses no opinion on this point. The items going to make up this $81,500 must, in stating the account, be treated as the private debts of Mr. Henry.

*Advances.* The contract between the parties is declared by the decree of the court to be that "the defendant agreed to take the bonds of the several ditch companies  *  *  *  to be by them issued for its holding of old bonds theretofore issued by said companies, and for all advances which the defendant had made or should make on account of, or for the benefit of, the several ditch companies.  *  *  *" It is obvious that, whatever else this contract embraced, it contemplated the completion of the ditches. That is plainly implied from what is expressed. By the very letter of the contract established by the decree, the defendant is entitled to bonds for all advances it had made or should make on account of, or for the benefit of, the several ditch companies. In stating the contract, in his opinion Judge BREWER says:

"The company agreed to take new bonds for its holding of old bonds, and for all advances which it had made or should make on account of these ditch companies." 33 Fed. Rep. 143.

The ditches were incomplete. In their unfinished condition, they were of little value. To give value to them, and to the bonds that were to be issued based upon them as a security, they must be completed. Without that, the bonds would be comparatively worthless in the hands of any one. For the money advanced for the construction of these canals after as well as before the beginning af this suit, down to the date of the appointment of the receiver, the defendant is entitled, by the

terms of the contract as established by the court, to be paid in bonds at par, and the account will be restated accordingly.

*Abilene Chattel Notes.* What are denominated in the record as the "Abilene Chattel Notes," amounting to $13,104, were deposited by Mr. Henry with the defendant as collateral security for his private indebtedness. The pledge of these and other collaterals was in writing, and expressly states that they are to stand as security for any "past, present, or future indebtedness." The master charges the defendant with the face value of these collaterals, but gives no reason for so doing. The proof shows that $3,341.81 has been collected on them. The notes were sent to Abilene for collection in due time, and the proof tends to show that all has been collected on them that can be; but, whether that be so or not, there is not a syllable of testimony to show that the defendant has been guilty of the slightest negligence in respect to these collaterals, or that it has done anything, or omitted to do anything, to render it liable for such portions of the collateral as it has not collected. And in this accounting it is chargeable only with the amount collected, namely, $3,341.81.

*The Tribune Note.* By the laws of Colorado, judgments draw interest; and the master erred in not computing interest on the judgment on the $25,000 note, known as the "Tribune Note," down to the date of its payment by the sale of the collateral, namely, December 5, 1887.

*Interest.* The defendant is entitled to have interest computed on the notes and demands he holds against Mr. Henry down to the date of the master's report. It is also entitled to have interest computed on its demand against the ditch companies, and for its advances to said companies, until it received, or should have received, bonds in payment; and the account will be restated accordingly.

*The Balance Claimed on the Sheep-Ranch and Phœnix Notes.* The balance claimed to be due on the sheep-ranch note of $10,000, and the Phœnix note of $3,500, is stated to have been settled in the first statement of accounts filed by the defendant. There is a conflict of evidence on the point, and I think the master, under all the circumstances, rightly held the defendant to the statement of its account as first made and filed.

*Colorado Delinquent Account.* The account known as the "Colorado Delinquent Account," to the amount of $35,868.79, was settled and paid, as shown by an entry in the defendant's books, by two notes of Carter-Cotton of $17,500 each, and by a payment of $868.79 in cash. It is claimed that this is an erroneous entry, and that it was made by mistake; but the agent or clerk of the defendant who made the entry, which is very full, plain, and explicit, is not called to explain by whose direction or authority he made it, or that it was not made by the direction of some officer or agent of the defendant having authority to direct it. In the absence of such proof, it must be presumed to have been made by authority of the company. The verbal testimony on the question of this payment in the mode stated is conflicting; but, in view of the entry in the books, the master rightly held that this account had

been settled to the amount stated. The exceptions to the Hazleton item of $2,720.13, and the Baker item of $3,900, which belong to the Colorado delinquent account, are also overruled.

*Commissions.* The exceptions to the commissions allowed Mr. Henry are overruled. There is a conflict in the evidence relating to this item, and I will not disturb the finding of the master.

*Kansas Delinquent Account.* T. C. Henry & Co., of Abilene, Kan., as loan and collecting agents for the defendant, became indebted to the defendant for moneys received and collected, and not accounted for, in about the sum of $77,000. To pay or to secure this,—and whether in payment or as collateral security is the question in dispute,—Henry turned over to the defendant notes and obligations due Henry & Co. to the amount of about $80,000. It is quite obvious that the securities thus turned over were of much less value than the defendant's claim against Henry & Co. on account of their delinquencies. The plaintiff is unable to produce any writing to show that these securities were taken in absolute payment. He introduces a letter, written by himself, referring to the Abilene business, which, as I construe it, supports the defendant's contention. Writing from Denver to his partner at Abilene, he says:

"The Travelers [meaning the defendant] have all my property here, and I have no way to protect the Kansas office creditors, unless it is done in your deal. I do not care for the Travelers, and I want a list of the assets; and I want to be sure there is no slip about paying debts before the office is actually sold, and everything turned over to them. I have been caught once."

The Kansas office creditors—that is, the local creditors of the firm of T. C. Henry & Co.—were protected in the deal for the sale and purchase of the Kansas office, embracing abstracts, furniture, etc. The defendant paid therefor $25,000, all of which went to satisfy the local or "Kansas office creditors;" but no provision was made in that "deal" for the delinquent account due the defendant. The transaction is witnessed by a written agreement which says nothing on the subject now under discussion. The officers and agents of the defendant company, including Mr. Carpenter, who was the partner of Mr. Henry in the Abilene business, and who, with Mr. Henry, constituted the firm T. C. Henry & Co., testified that they were taken as collateral; and I think the clear, and I might say the overwhelming, weight of the evidence supports that view. There are circumstances connected with that transaction, disclosed by the evidence, which satisfy me that these notes and obligations were taken as collateral, and not as payment of this indebtedness.

*Note of $5,000.* On the question as to whether the note of $5,000, dated June 24, 1884, was settled in the sale to Carter-Cotton of the stock of the North Poudre Land & Canal Company, there is no written evidence, and the oral testimony is conflicting; and, while I think there is a slight preponderance of evidence in favor of the defendant, that preponderance is not so clear and decided as to justify the court in setting aside the master's finding.

Counsel will prepare and submit to the court, for the signature of the judge, a decree in conformity to this finding. I take it for granted that the defendant desires to enter a prayer for appeal both from the original and present decree, and that the plaintiff desires to enter a prayer for appeal from so much of the present decree as sustains any exceptions to the master's report; and the conclusion of the decree will pray for these appeals, and note their allowance. The clerk will file this opinion in the record of the case, and embrace it in the transcript to the supreme court, if an appeal is taken.