## LADD & TILTON BANK v. BOYLE.

### In re HALL.

(Circuit Court of Appeals, Ninth Circuit. May 5, 1924. Rehearing Denied June 9, 1924.)

#### No. 4155.

1. **Appeal and error** ⬤⟹931(10)—**Findings of special master presumptively correct.**

   The findings and conclusions of a special master on evidence taken before him have every reasonable presumption in their favor, and are not to be set aside or modified, unless there clearly appears to have been error or mistake on his part.

2. **Husband and wife** ⬤⟹49½(7)—**Conveyance to wife of property paid for by husband is presumptively a gift or advancement.**

   Where real estate purchased with money of the husband is conveyed to his wife, it is presumptively intended as an advancement or settlement, and while this presumption may be overcome the evidence, to have that effect, must be of the most convincing and satisfactory kind.

Appeal and Cross-Appeal from the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Suit in equity by W. R. Boyle, trustee in bankruptcy of C. M. Hall, against the Ladd & Tilton Bank. From the decree, both parties appeal. Affirmed.

Prescott W. Cookingham and Leo J. Hanley, both of Portland, Or., for appellant.

John M. Boyle and C. M. Boyle, both of Tacoma, Wash., and Samuel B. Lawrence, of Portland, Or., for appellee.

Before ROSS, HUNT, and RUDKIN, Circuit Judges.

ROSS, Circuit Judge. The trustee of the bankrupt estate of Hall, whose declaration of bankruptcy was entered June 7, 1921, in pursuance of an involuntary petition of some of his creditors filed June 3d of the same year (he having theretofore been doing business in the city of Portland under the firm name of C. M. Hall Produce Company), brought suit against the appellant bank, the complaint setting out 10 causes of action, all but the first of which relate to alleged preference payments made by the bankrupt to the bank while he was hopelessly insolvent, of which insolvent condition the bank is alleged to have had at the time full knowledge. The remaining cause of action—the first counted on—relates to the payment to the bank of $10,000 to be hereafter specifically referred to.

The case was referred to a special master, before whom the evidence, including a large number of book accounts, was introduced, all of

which, as appears from his report and findings of fact, was most carefully considered, resulting in the conclusion that all of the payments referred to in the last 9 counts of the complaint were preferential payments under the United States Bankrupt Law (Comp. St. §§ 9585–9656), resulting in a net loss to the estate of the bankrupt, for which the appellant bank was liable. That conclusion respecting those payments was approved by the court below.

[1] An attentive reading and consideration of the statement of evidence and of the findings and report of the special master, and of the opinion of the trial court, satisfies us that in that respect both the court and the special master were right—especially in view of the well-established law that under such circumstances the conclusions of the master have every reasonable presumption in their favor and are not to be set aside or modified, unless there clearly appears to have been error or mistake on his part. See Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Callaghan v Myers, 128 U. S. 617, 9 Sup. Ct. 177, 32 L. Ed. 547; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764. The master also sustained the claim of the trustee of the bankrupt estate made in the first count of the complaint, relating to the $10,000 payment made to the appellant bank, which conclusion the court below rejected, holding that that payment was not a preferential one.

The substance of the evidence concerning the money with which that payment was made is as follows: Hall was, for a number of years, doing business in Portland under the name of C. M. Hall Produce Company, dealing largely, if not entirely, in butter, eggs, and cheese, receiving such produce from various places in the states of Oregon, Washington, and California. The appellant bank, which became his bank, was well aware of the nature of his business, and from the time that that relationship was established until the bankruptcy proceedings against him were commenced, loaned to him from time to time, sometimes upon his note, sometimes upon securities that he gave it, and often allowing him to overdraw his account in very considerable amounts. His business with the bank was conducted through its assistant cashier, Mr. Blohm.

When Hall moved with his family to Portland for the purpose of establishing the business that has been referred to, he purchased a two-story residence known as 1245 Laddington Court, located on lot 6 and a part of lot 5 in block 60 of the Laurelhurst tract, where he established the family home and continued to occupy it as such throughout the period in question, the purchase price being $8,000, which included the assumption by the purchaser of an existing $3,000 mortgage thereon; $1,200 was paid in cash, and the remaining payments were to be made monthly, which Hall made from the proceeds of his business. He subsequently made improvements on the house at a cost of from $1,500 to $1,800, which he likewise paid. All of these payments were made prior to the year 1921. He had the title to the property put in his wife's name, at the suggestion of her mother. Hall testified that he "just did it as a matter of convenience." He further said:

"While the property was put in Mrs. Hall's name, I figured it was to be our home. I figured it was as much mine as her's. I put it in her name, and it was to be our home."

Both he and his wife testified that there was no prior arrangement or agreement regarding the conveyance. They both testified that it was the home of the family, the expenses of which Hall paid out of his business. The evidence shows without conflict that the business of Hall was quite extensive, but that it gradually went from bad to worse. The witness Gemmel, an accountant, testified:

"I had something to do with the keeping of the books and records of Mr. Hall and the Hall Produce Company. I used to go down at the end of the month and close his books and check his bank account, and sometimes during the month I made a trip down there. I was down there in that way for the last four or five years."

He further testified that during the last week in January or the first week in February of 1921, at the request of Blohm and Hall, he prepared a statement of Hall's condition up to January 1, 1921, and made notations on it from Blohm's notations. The statement is as follows:

Statement of C. M. Hall Produce Company, Portland.
Dec. 13th, 1920.
Assets.

| | |
|---|---|
| Accounts receivable | $12.492.17 |
| Estate account | 6,128.54 |
| Loans account | 1,119.30 |
| C. M. Hall | 12.267.28 |
| Real estate | 9,086.48 |
| Stock on hand | 31,160.20 |
| Loss | 579.65 |
| Suspense account | .67 |
| | $72,834.29 |

Liabilities.

| | | |
|---|---|---|
| Bank | $ 3,278.89 | |
| Accounts payable | 32,671.82 | $35,950.69 |
| C. M. Hall, cap. | | 150.00 |
| Bills payable, bal. | | 233.60 |
| Bills payable | | 36,500.00 |
| | | $72,834.29 |

The notation which the witness testified was in Blohm's handwriting is as follows:

"From this statement there is an item of $12,500 charged against himself. If this could be collected, I think the statement was all right. The $12.267.28 is an overdraft, and represented the amount he was owing to the business, and part of that might have been on the house. The item of real estate is the house, and it contains the notation made by Mr. Blohm, and at that time he told me we better increase that $2,000 to Portland Trust Company, and that is the figures there showing it. This statement shows that the assets were over $12,000 less than the liabilities. After the statement was submitted to Mr. Blohm, he said he would like to get one up to date."

The further statement so requested, marked Exhibit No. 1, the witness testified was prepared and completed by him about March 1st, 2d, or 3d. "I think," said the witness, "it was earlier than the 3d of

March. My judgment is that it was about the 2d day of March it was completed—about the 2d, because on the 4th of March, as I remember, he took it down to the bank early, and he had to wait until afternoon before he got to see them. That was on the 4th of March." Exhibit 1 is as follows:

C. M. Hall Produce Company, Jobber.

Butter, Eggs, Cheese. Fourth and Glison Streets, Portland, Oregon.

3—1—21.

| | | |
|---|---:|---:|
| Accounts receivable | $21,311.14 | |
| Stock of merchandise | 3,445 50 | |
| Real estate | 12,086.46 | |
| Fixtures | 6,128.54 | $42,971.66 |
| | | |
| Personal insurance, $20,000.00 | | |
| Accounts payable | $47,602.02 | |
| Bills payable, bank | 32,500.00 | |
| Bank O. D | 4,788.38 | $87,890.40 |
| | | $44,918.74 |

That March statement showed that Hall's assets, including $12,086.46 (the stated value of the property the title to which was in his wife's name), amounted to but $42,971.66, whereas his liabilities amounted to $87,890.40. The record shows that at that time Hall was indebted to the bank on his notes in the sum of $30,000, and from $6,000 to $7,000 in overdrafts. Out of that condition of affairs, the $10,000 matter arose. Hall testified to the effect that, upon the submission of the last-mentioned statement, in which, as has been seen, the residence property was listed as among his assets, Blohm did not know that the property was in his wife's name, although he knew that it was occupied as the family home; that he told Blohm he "was in the hole," but did not know to what extent; and that Blohm replied that, "if you are in the hole, you have a house out there, and we can loan you some money on it." The witness continued:

"He asked me what the place was worth, and I told him over $15,000, and he said he could loan me $10 000 on the property if it was worth that much. About the 20th or 21st of March, he said he could fix up the mortgage so I could have the $10,000. I thought the $10,000 would be a loan from the bank. He said, however, that he would pass it through the Nedra Company. I knew nothing about the Nedra Company at that time, but I believe it is one of the bank's concerns; that was about the 20th of March. He said he would have the papers fixed up, and I told him that it was in Mrs. Hall's name, and he said she could come down and sign the mortgage. My conversation was the day before she came down, I think; I am not just clear on that. I signed the note and mortgage in the afternoon, and my wife was not present. The next morning my wife was instructed by me to come down and sign the mortgage. I told her that the bank was going to loan me $10,000. I think I went up to the bank the same morning as she signed the note and mortgage, and Mr. Blohm said he had the $10,000, and it might have been on the following day after she signed it. I cannot say definitely."

The check was made by the Nedra Company to the order of Cecil M. Hall for $10,000, and was at once indorsed by Hall and turned over to the bank, to be applied on his indebtedness as it saw proper. In Schedule B, filed by Hall in the bankruptcy court, he deliberately

swore that he was not the owner of any real property, and by a subsequent amendment to that schedule made oath that he "had at the time of the adjudication therein and still has in his possession at the home of his wife at 1245 Laddington Court, Portland, Oregon," certain designated household furniture. Moreover, the record shows that Mrs. Hall presented a claim against the bankrupt estate, in which she made oath that:

"C. M. Hall is doing business under the name of C. M. Hall Produce Company; the person by (or against) whom a petition for adjudication of bankruptcy has been filed was at and before the filing of said petition, and still is, justly and truly indebted to said deponent in the sum of $10,125. That the consideration of said debt is as follows: $10,000 was loaned to said bankrupt on March 21, 1921, with interest at 6 per cent. per annum from March 21, 1921, to June 7, 1921, the date of the adjudication of bankruptcy."

Blohm's testimony was to the effect that the $10,000 loan was made through the Nedra Company, substantially all of the stock of which was owned by the bank, for the reason that at that time the bank was making no mortgage loans; that he conducted the negotiations for the Nedra Company, but was called away before the closing of the loan, and therefore was not aware that the check was made in the name of Hall, instead of to Mrs. Hall; but his testimony is positive to the effect that the understanding was that the loan was made to her on her property, and that she was to turn the money over to the bank to her husband's credit, and that testimony finds strong support in this testimony of Mrs. Hall:

"I never had anything to say about mortgaging the place, or making a loan on the property, or anything of that kind was never talked of at all. Mr. Hall came home one evening and suggested a loan of $10,000 to the bank on the house. He told me he had made all arrangements, and wanted me to go down the next morning and sign the mortgage, which I did. At another time he suggested that I sign another mortgage, I do not remember for how much. He brought it home one night for me to sign. It was an $800 mortgage, and I presume it was the same as the first; I don't know. However, he simply brought it home and asked me to sign it, and I did. The first mortgage I went down to the bank to sign; the second one I did not. When I went down to the bank to sign the first mortgage, Mr. Blohm was the only one present. It is hard to tell the exact words that were said, but it was substantially this: Mr. Blohm said, 'I suppose you know that Mr. Hall is in bad circumstances and needs money;' and I said, 'Yes, he told me about it, and told me the mortgage would be ready for me to sign;' and then he put the mortgage on the table. I merely glanced at it. I could not say what the mortgage said; I merely glanced at it, glanced through the mortgage there and signed it, and he said, 'Now, we will just give the check to Cecil.' Then I went out of the bank. There may have been something more said, which I cannot now remember, but that was about all that was said. I left the bank, and left them to finish it. I did not see the check at that time, and I never saw it until this morning in the courtroom. The check was not delivered to me. Mr. Blohm said he would give it to Cecil; that was my husband. He took me to the window and introduced me to some one. I don't even remember who the gentleman was, and I went out of the bank. There was nothing said between me and the gentleman to whom I was introduced. Mr. Blohm merely told this man that I was the wife of Cecil Hall. I don't remember anything being said by Mr. Blohm, or any officer of the bank, at the time, as to where the money should go. *I said to Mr. Blohm that I would do anything to help Cecil out. I remember that I said that, when he said that Cecil was in bad circumstances in his business.* There was no definite

understanding or agreement at all as to what disposition should be made of this money. I did not know what Cecil was going to do with it, any more than that he was going to use it in his business in some way."

[2] The master found and held in effect that the conveyance in the name of the wife was not intended by either husband or wife as a gift to her, but that, as the property was purchased by Hall with his creditors' money, the wife became a mere custodian or trustee of the fee. The court, however, as has been said, rejected that view, saying, among other things, that its effect is that:

"When a husband purchases property, conveys it to his wife, with no understanding or agreement as to how she should hold the title, and some three or four years later is adjudged bankrupt, that the trustee may go back and divest the wife of title to the property."

It is undoubtedly the law that a presumption arises from such a conveyance as is here presented that it was intended as a gift or advance to the wife, which presumption may be overcome by the facts and circumstances of the case. It was so adjudged by the Supreme Court of Oregon in the case of De Roboam v. Schmidtlin, 50 Or. 388, 92 Pac. 1082, where that court said:

"As a general rule, where one person purchases real estate and pays the purchase price, but takes the deed in the name of another, a resulting trust arises by operation of law in favor of the one who furnished the purchase money. The person in whose name the title is taken becomes a trustee for the one who paid the money, and the trust so created is exempt from the operation of statute of frauds and may be shown by parol. But when the deed is taken in the name of one whom the person paying the purchase money is under a legal or moral obligation to provide for, as a wife or child, the presumption is that the purchase was intended as an advancement or settlement, and not in trust for the person furnishing the money. This presumption may be overcome by testimony, but to have that effect the evidence must be of the most convincing and satisfactory kind."

We agree with the court below that the evidence in the present case was far from overcoming that presumption.

The judgment is affirmed, without costs to either party.